IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 1466-03 & 1480-03






LAKEITH LAWAYNE COLEMAN, Appellant



v.



THE STATE OF TEXAS





ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW


FROM THE FIRST COURT OF APPEALS


HARRIS COUNTY





 Cochran, J., filed a concurring opinion, joined by Price, Johnson, and
Holcomb, JJ.


O P I N I O N 



 Although I join the Court's opinion, I add the following remarks for two reasons. First,
I am concerned that many deadly weapon findings now no longer bear any relationship to the
original legislative purpose. Second, I think we could provide greater guidance on when it is
rational to infer that one who possesses a deadly weapon has "used" it to facilitate the
commission of a drug possession offense. 

I.


 Use of the "deadly weapon" enhancement statute has followed the "Big Bang" theory
of creation. The statute was intended as a simple but powerful deterrent message to those about
to embark upon their next criminal enterprise: leave your guns and other deadly weapons at
home. One Senate subcommittee speaker explained the rationale:

 [T]he point we are trying to get to when we use the language "used or exhibited"
is simply to say that if a person is going to commit an offense, leave that firearm
at home. Don't take it with you. Don't have the opportunity to use it; don't
exhibit it. Don't be around a firearm if you are going to commit an offense
because you know that if you do the offense or the penalty, or the combination
of the two would perhaps be more onerous than if you commit the offense
without the use of a firearm. (1)


That specific and limited deterrence purpose was, and is, laudable. However, once that original
big bang occurred, the universe of deadly weapon findings expanded exponentially. It has fallen
prey to "mission creep" into areas unforeseen and probably unintended by the Legislature. It
is applied to cars used in the commission of D.W.I. (2) It is applied to a septic tank containing
liquid when a mother, responsible for watching a child, fails to cover that tank, and the child
drowns in it. (3) It is applied to a man's sexual organ and bodily fluids when he is H.I.V. positive
and rapes a child. (4) It is applied to a dentist's sedatives when used to anesthetize a patient who
accidentally dies during dental treatment. (5) Indeed, one is hard pressed to think of how any
homicide-murder, manslaughter, or criminally negligent homicide- might be committed
without the use of some "deadly" agent that caused the victim's death. (6) 

 The use of deadly weapon findings has grown out of all bounds. Given the literal words
of the statute--"a deadly weapon ... was used or exhibited during the commission of a felony
offense or during immediate flight therefrom"--this is not surprising. Ultimately, however,
it is the Legislature's prerogative to amend the law if the words of the statute are being applied
more broadly than the Legislature intended. Until that time, we are left with the literal wording
of the statute and our historical interpretation of it. 

 The case that began the "Big Bang" was Patterson v. State, (7) in which this Court held that
"use" of a deadly weapon "'extends as well to any employment of a deadly weapon, even its
simple possession, if such possession facilitates the associated felony.'" (8) In that case, officers
executed a search warrant at a third party's home. They found the defendant sitting on a sofa
with a suede bag containing methamphetamine, a wallet containing $905, and a "gun boot"
containing bullets, on the end table beside him. Patterson told the police that he had a gun on
the floor between his left leg and the end of the sofa. Indeed he did. This Court held that the
evidence was sufficient to support an affirmative finding that he used a deadly weapon while
committing the felony offense of possessing methamphetamine. (9) Although we did not
expressly say so, Patterson involved a situation in which the defendant arrived at another
person's home armed with a gun and carrying drugs. One might fairly ask why Patterson was
toting his gun on what would appear to be something more than a mere social visit unless he
was using it to protect his drugs. Although there was no evidence that Patterson had
affirmatively employed the weapon while in the apartment, it was not irrational to think that,
under the specific circumstances in that case, those two items- the gun and drugs- went
together, as in the old Sinatra song, like "Love and Marriage." 

 Perhaps Judge Rusty Duncan, in his 1989 decision in Patterson, construed the statutory
word "use" in an overly broad manner, when he stated that mere possession of a deadly weapon
suffices to constitute its use if that possession furthers or facilitates the felony. But his
construction has endured and prospered in Texas law for the past fifteen years. It is now
gospel. And, after Patterson, our jurisprudence has subtly morphed, such that possession of
any drugs, actual or constructive, coupled with possession of a deadly weapon, either actual or
constructive, will almost always support a deadly weapon finding. This case, for example,
might leave the impression that if you keep any drugs in your home, office, or car, and if you
also own a gun and keep it in your home, office, or car, possession of these two items in the
same general location suffices to prove, beyond a reasonable doubt, that the guns were "used"
to facilitate the possession of the drugs. I do not think that the majority opinion intends that
implication. Yet it lingers in the air. 

II.


 This case, however, is not about the mere possession of "any" drugs. It is about the
operation of a large-scale drug manufacturing plant and retail distribution outlet. The house
was littered with illicit drug manufacturing material, wholesale drug material, retail drug items,
and a "cash register" safe in the bedroom. (10) Along with the extensive drug paraphernalia, there
were three guns in this house. Appellant was purportedly out on his appointed "drug delivery
scheduling" rounds when he was arrested, but he did not have guns, drugs, or money with him. 
When the officers searched his house, (11) they found three weapons: a nine millimeter handgun
loaded with two bullets, a twenty-two caliber pistol loaded with three bullets, both of which
were found in the front bedroom, and an unloaded assault rifle in an undescribed location. 

 The jury could rationally find that appellant used those guns to facilitate his drug
trafficking business under the "fortress theory" of a deadly weapon finding. Guns that are
available to protect a drug trafficker's premises, should anyone attempt to steal the valuable
product inside or disrupt the ongoing business operations, are "used" to facilitate the illicit
drug enterprise. (12) It matters not whether the drug trafficker was actually on the premises or
actively using the guns at the moment he is arrested or even seen. The king in his castle "uses"
his turret cannons both when his soldiers fire them and when they sit for years awaiting a
possible attack. He "uses" the halberds hanging in the hall both for a current war and to deter
a future one.

 Unfortunately, many of our "guns and drugs" cases are not so clear-cut. (13) Thus, in
determining the sufficiency of evidence to support a deadly weapon finding in these cases,
Texas trial and appellate courts may, like the federal courts, rely on a number of different
factors. These include:

 1) the type of gun involved; (14)


 2) whether or not the gun was loaded; (15)


 3) whether or not the gun was stolen; (16)


 4) the proximity of the gun to the drugs, drug paraphernalia, or drug manufacturing
materials; (17) 


 5) the accessibility of the gun to whomever controlled the premises; (18)


 6) the quantity of drugs involved; (19) and

 

 7) any evidence that might demonstrate an alternative purpose for the presence of
the guns. (20)


In short, triers of fact and reviewing courts must look for some evidence showing that the
particular defendant's actual or constructive possession of a deadly weapon did, in fact, further
the drug trafficking operation. (21) Mere presence is not enough. (22) Proof showing simply the
simultaneous possession of a gun and drugs does not suffice to establish, beyond a reasonable
doubt, that the gun facilitated commission of the drug offense. 

 With these comments, I join the opinion of the Court. 

Cochran, J.

Filed: September 29, 2004

Publish
1. Tyra v. State, 897 S.W.2d 796, 803 (Tex. Crim. App. 1995) (Maloney, J., concurring)
(quoting Senate Subcommittee on Criminal Affairs, Transcript of Discussion on SB 152, Feb. 15,
1977, at p. 15). Judge Maloney quoted an unnamed speaker at the Senate Subcommittee Hearing on
SB 152, the bill that ultimately became section 3g of Tex. Code Crim. Proc. art. 42.12, the "deadly
weapon" statute. See also Muscarello v. United States, 524 U.S. 125, 132-34 (1998) (setting out
and analyzing Congress's similar intent when it enacted analogous federal statute).
2. See Mann v. State, 58 S.W.3d 132, 132 (Tex. Crim. App. 2001).
3. See Rankin v. State, 46 S.W.3d 899, 900 (Tex. Crim. App. 2001).
4. Najera v. State, 955 S.W.2d 698, 700-01 (Tex. App. - Austin 1997, no pet.).
5. Davis v. State, 955 S.W.2d 340, 352 (Tex. App. - Fort Worth 1997, pet. ref'd).
6. See, e.g., Ex parte Beck, 769 S.W.2d 525, 526 (Tex. Crim. App. 1989) (stating that "any
allegation which avers that a death was caused by a named weapon or instrument necessarily includes
an allegation that the named weapon or instrument was, 'in the manner of its use ... capable of causing'
(since it did cause) death"). 
7. 769 S.W.2d 938 (Tex. Crim. App. 1989).
8. Id. at 941 (citation omitted; emphasis in original).
9. Id. at 942.
10. That evidence included the discovery of: (1) several hundred small brown vials in the dining
room and back room which were consistent with how phencyclidine or PCP is packaged for retail sale;
(2) a Crown Royal bag, containing 2 Rolex watches, several rings, a couple of necklaces and other
jewelry plus more than $11,000 in cash, stored in the bedroom safe along with appellant's I.D.; (3) 20
grams of crack cocaine, enough for "200 hits" at the retail level; (4) 150 grams of powdered cocaine,
whereas 1/10 to ½ gram of cocaine suffices for a single personal consumption dose; (5) 3,387 grams of
PCP, whereas 4 grams of PCP is consistent with a personal use amount. The cocaine by itself was
purportedly worth $30,000 at the retail level.
11. Appellant's defense at trial was that, while this house might be a drug manufacturing and
wholesale supply center, it was not his house and he was unconnected to either the drugs or the
weapons. Instead, the house belonged to his mother, but it had been abandoned after a flood.
12. See, e.g., United States v. Head, 927 F.2d 1361,1366 (6th Cir. 1991) (discussing the
fortress theory and holding that "if it reasonably appears that firearms found on premises controlled or
owned by defendant and in his actual or constructive possession are to be used to protect the drugs or
to facilitate a drug transaction, then the firearms are 'used during and in relation' to a drug trafficking
offense"); United States v. McFadden, 13 F.3d 463, 465 (1st Cir. 1994) (concluding that the
presence of a firearm for protection created a drug fortress; evidence that unloaded shotgun was found
under defendant's mattress, together with undercover officer's marked buy money, more money, and
$20 single packs of crack cocaine, sufficient to show use of a gun in relation to a drug trafficking crime,
even though cocaine sale had taken place in apartment foyer, not bedroom); United States v. Wesley,
990 F.2d 360, 365 (8th Cir.1993) ("presence and ready availability of a firearm at a house where drugs
are dealt" is sufficient to show use of firearm; defendant need not actually have weapon in hand,
proximity of guns to drugs sufficient).
13. Compare Wynn v. State, 847 S.W.2d 357, 360-61 (Tex. App. - Houston [1st Dist.] 1993)
(evidence insufficient to support deadly weapon finding when weapons found under a blanket in
different bedroom from drugs and that bedroom did not appear to be defendant's bedroom even
though evidence indicated that house was used for drug delivery operations), aff'd on other grounds,
864 S.W.2d 539 (Tex. Crim. App. 1993), with Gale v. State, 998 S.W.2d 221, 224-26 (Tex. Crim.
App. 1999) (evidence supporting deadly weapon finding sufficient when unloaded firearms were found
in bedroom closet and one was inside trash bag that contained 20 pounds of marijuana divided into
smaller, retail packages); Reyes v. State, 906 S.W.2d 256, 258 (Tex. App. - Fort Worth
1995)(evidence sufficient for deadly weapon finding when unloaded pistol and shotgun were found in
master bedroom, unloaded shotgun found in living room and ammunition was not located close by; no
reference to amount or location of cocaine), rev'd on other grounds, 938 S.W.2d 718 (Tex. Crim.
App. 1996); Crouch v. State, 858 S.W.2d 599, 601 (Tex. App. - Fort Worth 1993) (evidence
sufficient to support deadly weapon finding in illegal investment in drugs conviction even though
defendant did not have pistol on him when he bought drugs; waiting in his car for drug buy to occur with
loaded pistol on floorboard sufficed to show its use during commission of illegal investment offense). 
See generally United States v. Ceballos-Torres, 218 F.3d 409, 414 (5th Cir. 2000) (discussing but
rejecting position that a "mere presence" or proximity test which "is one based on generality--anytime a
drug dealer possesses a gun, that possession is in furtherance, because drug dealers generally use guns
to protect themselves and their drugs. What is instead required is evidence more specific to the
particular defendant, showing that his or her possession actually furthered the drug trafficking offense").
14. For example, automatic weapons or large-bore pistols are more likely connected to a drug
transaction than a hunting rifle or shotgun. See, e.g., Gale v. State, 998 S.W.2d 221, 222-23 (Tex.
Crim. App. 1999) (guns found in closet with drugs included "one Ruger-Mini-14 rifle... an Uzi semi-automatic assault-type rifle, one nine-millimeter rifle, one nine millimeter handgun..."); see also United
States v. Moses 289 F.3d 847, 851 (6th Cir. 2002) (stating that possession of a .22 pistol is not "an
uncommon weapon among those who commit drug offenses"); United States v. Drozdowski, 313
F.3d 819, 823 (3d Cir. 2002) (noting that handguns "are more likely to be used in connection with a
drug offense than long, hunting guns"); United States v. Cantero, 995 F.2d 1407, 1411 (7th Cir.
1993) (noting that the handgun "is a 'tool of the [drug] trade' because it is easy to conceal yet deadly")
(citation omitted); United States v. Green, 889 F.2d 187, 189 (8th Cir. 1989)("[u]nlike the rifle in the
hypothetical, however, guns like Green's are used only for personal protection"); compare United
States v. North, 900 F.2d 131 (8th Cir. 1990) (unloaded shotgun, antique cap and ball pistol, and
inoperable .22 rifle found in drug defendant's son's bedroom did not qualify for firearm enhancement
because: (1) the antique pistol was a nineteenth century model that required gun powder and lead balls;
(2) the shotgun was an unloaded hunting gun belonging to the defendant's son; and (3) the .22 rifle was
inoperable); United States v. Hernandez, 187 F.3d 806, 808-09 (8th Cir. 1999) (trial court did not
clearly err in finding that defendant's unloaded shotgun in truck's sleeping compartment was
unconnected to his offense of transporting 300 pounds of marijuana in truck trailer). 
15. See Dimas v. State, 987 S.W.2d 152, 154 (Tex. App. -- Fort Worth 1999, pet ref'd)
(loaded rifle found inches from cocaine); Charles v. State, 915 S.W.2d 238, 241 (Tex. App. --
Beaumont 1996, pet. ref'd)(cocked and loaded pistol under sofa in same room as drugs); see also
Drozdowski, 313 F.3d at 823 (although handguns were unloaded when found, one of them was stored
in a case with its ammunition); United States v. Starks, 309 F.3d 1017, 1026-27 (7th Cir. 2002)
(upholding firearms enhancement when defendant was found within reach of a loaded gun and there
was circumstantial evidence showing that he was aware of the presence of guns); Moses, 289 F.3d at
851 (considering various factors, including whether firearm was loaded, in determining whether a
firearm was related to a particular drug offense).
16. See United States v. Ceballos-Torres, 218 F.3d 409, 415 (5th Cir. 2000).
17. See Moreno v. State, 978 S.W.2d 285, 289 (Tex. App. - Fort Worth 1998, no pet.) 
(handgun and semi-automatic machine gun beside laundry basket with cocaine in it); Sanchez v. State,
906 S.W.2d 176, 181 (Tex. App. -- Fort Worth 1995, pet. dism'd & ref'd) (Uzi and Ruger assault
rifle found next to cocaine on closet shelf); see also United States v. Noble, 246 F.3d 946, 954 (7th
Cir. 2001) (sufficient nexus when firearm is found in a closet that is adjacent to room where drug
proceeds were kept); United States v. Eastland, 989 F.2d 760, 770 (5th Cir. 1993) (nexus between
offense and weapon when "methamphetamine, currency, and paraphernalia" were stored in same
location as guns). Compare United States v. Zimmer, 14 F.3d 286, 290-91 (6th Cir. 1994) (when
evidence established that defendant's rifles, found in living room and bathroom far from secret
marijuana-growing room in basement, were used for hunting, there was no nexus between weapons
and drug trafficking). 
18. See, e.g., Beal v. State, 35 S.W.3d 677, 686 (Tex. App. -- Houston [1st Dist.] 2000)
(loaded handgun carried by co-defendant in car to drug buy), rev'd on other grounds, 91 S.W.3d
794 (Tex. Crim. App. 2002); Henton v. State, 893 S.W.2d 165, 168-69 (Tex. App. - Houston [1st
Dist.] 1995, no pet.) (defendant displayed gun at time officers entered apartment; cocaine found in next
room); Drozdowski, 313 F.3d at 823-24 (collecting cases holding that evidence of guns which are
secreted from view of casual visitors but are easily accessible to one who knew their hidden location
support a nexus between use of guns to facilitate drug possession).
19. For example, a driver who is found with a marijuana cigarette in one pocket and a gun in
another pocket is much less likely to be using the gun to protect that lowly little cigarette than is the
same driver who has 200 pounds of marijuana in the back of his truck.
20. For example, evidence that the guns were stored in a gun rack or cabinet, the presence of
hunting trophies on the wall, testimony concerning hunting trips, etc. might raise an alternative, legitimate
purpose for the gun possession. See Moses, 289 F.3d at 851 (absent any circumstantial evidence
indicating that pistol was used only for hunting, such as testimony from any hunting companions, fact-finder was not required to believe defendant's self-serving testimony that he used gun only for hunting
raccoons).
21. Ceballos-Torres, 218 F.3d at 414.
22. Id.