

2002 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-12-2002

# USA v. Drozdowski

Precedential or Non-Precedential: Precedential

Docket No. 01-3190

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2002

Recommended Citation

"USA v. Drozdowski" (2002). *2002 Decisions.* Paper 797.
http://digitalcommons.law.villanova.edu/thirdcircuit_2002/797

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2002 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed December 12, 2002

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 01-3190

UNITED STATES OF AMERICA

v.

DAVID DROZDOWSKI, Appellant

On Appeal From the United States District Court
For the Middle District of Pennsylvania
(D.C. No. Cr. 99-00200-1)
District Judge: Honorable Edwin M. Kosik

Argued: September 17, 2002

Before: BECKER, Chief Judge, SCIRICA and McKEE,
Circuit Judges.

(Filed: December 12, 2002)

ENID W. HARRIS, ESQUIRE
 (Argued)
Harris & Van Jura
11 W. Market Street, Suite 700
Wilkes-Barre, PA 18701-1991

Counsel for Appellant


THOMAS A. MARINO
United States Attorney
WILLIAM S. HOUSER (Argued)
Assistant U.S. Attorney
U.S. Attorney's Office
235 North Washington Avenue
Suite 309, Federal Building
Scranton, PA 18501

Counsel for Appellee

OPINION OF THE COURT

BECKER, Chief Judge.

U.S.S.G. S 2D1.1(b)(1) requires courts to increase a defendant's offense level by two levels if a dangerous weapon was possessed by the defendant in the course of a drug trafficking offense. Note (3) of the Commentary to S 2D1.1(b)(1) explains that this enhancement "reflects the increased danger of violence when drug traffickers possess weapons." The Note specifies that the "adjustment should

be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." This appeal by David Drozdowski, who was convicted of a drug offense and whose offense level was increased by two levels pursuant to S 2D1.1(b)(1), presents the question whether the adjustment applies when the weapons involved were not only unloaded but also arguably inaccessible because they were located under a desk, on top of and in front of which was piled a quantity of boxes, clothes, and bric-a-brac, much of which the investigating trooper had to move in order to get to the desk and to prevent its falling on him while he searched.

Because we find that the District Judge properly applied this enhancement and committed no other error, we affirm.

I.

In 1998, the Drug Enforcement Administration and Pennsylvania State Police initiated an investigation into

2

cocaine trafficking in Luzerne County, Pennsylvania. Drozdowski was identified as a distributor of cocaine who had been operating, with the assistance of his wife and other family members, since 1988. According to the evidence, Drozdowski's mother-in-law stored the cocaine at her house and, unbeknownst to his father, Drozdowski kept the proceeds from his business at his father's house. On several occasions in 1999, a confidential informant bought cocaine from Drozdowski at his home. In addition, the police kept Drozdowski under surveillance and monitored several phone calls in which Drozdowski arranged for the sale of cocaine. Drozdowski and his associates were arrested in August 1999 and the police executed search warrants at various locations, including the home of Drozdowski's father.

At trial, Trooper Jeffrey McGinness described the search of Drozdowski's father's home. The search turned up two revolvers: a .44 caliber and a .22 caliber. Neither of the guns was loaded, although the .44 caliber was stored in a leather case that also contained rounds for the pistol. Trooper McGinness found both weapons underneath a desk in a bedroom on the second floor of the house. In addition to the guns, the Trooper seized more than $31,000 in cash from a dresser in a second floor hallway and from another dresser in the bedroom where the guns were found. The police also discovered 1.2 grams of a chemical called "Inositol," which in the Trooper's experience is often used as a cutting agent. In the bedroom where the guns were discovered, the police found a box containing a large number of plastic, zip-lock bags. Finally, the police uncovered what Trooper McGinness described as "owe sheets": lists which are used to record money owed on drug transactions. On cross-examination, McGinness testified that the owe sheets appeared to be "older." The search did not uncover any drugs in the house.

As suggested above, the condition of the rooms in which the police found the guns is critical to our inquiry. The Trooper testified that the "upstairs bedrooms were piled with boxes, clothes, all types of items." App. at 197. When McGinness entered the room where he found the guns, he saw a "portion of [a] desk sticking out from the wall." Id. at

198. This was the desk under which he discovered the guns. When asked "[h]ow much of this stuff did you have to move to get to this desk in the first place," the Trooper stated that "I believe some of the top and a part of the right side I could see and get to, but everything else there was stuff piled on top and in front of the desk." Id. In response to the question "you had to move a lot of stuff just to get to this [desk] in the first place," the Trooper testified that

> There was sort of a walkway into the room where you could actually walk in where the stuff was piled so you could actually -- you may be able to get to the back closet and, like I said, is [sic] desk right on the right when you walk in, so I had to move some of the stuff from like underneath it and some of the things on top so it didn't fall on me while I was searching.

Id. Mindful of the adage that "a picture is worth a thousand words," we attach two photographs of the bedroom and the area around the desk where the guns were found. To those of the opinion writer's vintage, the quantity of junk in this room brings to mind what fell out of Fibber McGee's closet.1 Counsel for Drozdowski asked Trooper McGinness whether it was accurate to state that "to get at these guns . . . you couldn't just reach right in there and pull them out, you had to get this stuff out of the way" and the Trooper responded "[t]hat's correct." Id. at 199.

Drozdowski was found guilty of conspiracy to distribute and possess with intent to distribute in excess of five kilograms of cocaine in violation of 21 U.S.C. S 486, possession with intent to distribute cocaine in violation of 21 U.S.C S 841(a)(1), and use of a communication facility in

---

1. For those not of the writer's vintage, our reference is to the widely popular Fibber McGee and Molly radio show, which ran on NBC from 1935-1959. One of the show's standing gags involved the hall closet of the stars' 79 Wistful Vista residence. In searching for some lost object, Fibber would inevitably determine that it was to be found in the hall closet. Despite warnings from Molly, Fibber would open the door, only to be showered in junk from the perpetually overstuffed closet. Fibber would then famously declare, "gotta clean out that closet one of these days."

the distribution of a controlled substance in violation of 21 U.S.C. S 843(b). He was sentenced to a total of 292 months in prison.

The District Court had jurisdiction under 18 U.S.C. S 3231 and this Court has jurisdiction pursuant to 28 U.S.C. S 1291 and 18 U.S.C. S 3742. As the District Court's decision to apply the enhancement was essentially factual, we review for clear error. U.S. v. Isaza-Zapata , 148 F. 3d 236, 237 ( 3d Cir. 1998).

II.

Drozdowski argues that it was clearly improbable that the weapons the police found in his father's house were connected with the conspiracy to distribute cocaine. He bases his argument on the idea that because the guns were unloaded and buried under boxes and assorted bric-a-brac, they were inaccessible, and therefore it is clearly improbable that they were being used in connection with the conspiracy. Drozdowski also points to the facts that the guns were not found at his residence, they were not registered to him, and no drugs were discovered near the guns. The Guidelines do not give much guidance as to what constitutes "clearly improbable." The only light they shed on this issue is that the enhancement would not be merited if "the defendant, arrested at his residence, had an unloaded hunting rifle in the closet." Note (3) of the Commentary to S 2D1.1(b)(1).

It appears that defendants have rarely been able to overcome the "clearly improbable" hurdle. Although one court has characterized the jurisprudence as having generally limited absolution from the guidelines to cases "involving facts nearly identical to those of the hypothetical [unloaded rifle in closet]," United States v. Garcia, 925 F. 2d 170, 173 (7th Cir. 1991), it is our view that the Note (3) example is not meant to be exclusive.

Courts have relied on a number of variables in making the "clearly improbable" determination, including: (1) the type of gun involved, with clear improbability less likely with handguns than with hunting rifles, see United States v. Cantero, 995 F. 2d 1407, 1411 (7th Cir. 1993) (noting

5

that the handgun "is a 'tool of the [drug] trade' because it is easy to conceal yet deadly") (quoting United States v. Valencia, 913 F. 2d 378, 385 (7th Cir. 1990)); United States v. Green, 889 F. 2d 187, 189 (8th Cir. 1989)("Unlike the rifle in the hypothetical, however, [hand]guns like Green's are used only for personal protection"); (2) whether the gun was loaded, see United States v. North, 900 F. 2d 131, 134-35 (8th Cir. 1990) (clearly improbable that unloaded shotgun owned by defendant's son was used in drug conspiracy); Green, 889 F. 2d at 187-89 (not clearly improbable that unloaded handgun was used in connection with drug offense); (3) whether the gun was stored near the

drugs or drug paraphernalia, see United States v. Williams, 10 F. 3d 590, 596 (8th Cir. 1993) (enhancement upheld when "firearm was loaded and found in close proximity to the cocaine, currency and drug paraphernalia"); United States v. Eastland, 989 F. 2d 760, 770 (5th Cir. 1993) (enhancement upheld where "methamphetamine, currency, and paraphernalia" were present where the guns were found); and (4), most relevant to our inquiry here, whether the gun was accessible.

Despite the condition of the room in which the police found the guns, as described above, we find that it was not clearly improbable that these guns were connected to Drozdowski's cocaine distribution conspiracy. We come to this conclusion on the basis of a number of considerations. First, while the bedroom in which the trooper uncovered the weapons contained a great deal of junk, which took some time to move, the desk under which the guns were stored was "right on the right when you walk in[to]" the room and was not completely blocked. App. at 198. As the attached photographs show, the junk itself does not appear to have been heavy or difficult to move, and Trooper McGinness was able to find the guns under the desk relatively quickly. Clearly, the guns would have been much more accessible to one who already knew where they were located.

We also note that while there were no drugs in the house where the guns were found, there was a great deal of drug paraphernalia. Specifically, the room where the police discovered the guns contained the Inositol and the"owe

6

sheets," both of which were in the drawers of the desk itself, a large number of zip-lock bags, and a significant amount of cash. All of these items were within steps of the concealed guns. In addition, this conspiracy lasted several years and we are convinced that it is not clearly improbable that at some point during those years, these guns, found so close to the drug money and the owe sheets, were used in conjunction with the drug activity.

Ultimately, the question of whether it is clearly improbable that a gun was used in connection with a drug offense is a fact-bound determination. Applying the principles derived from the cases discussed above, we cannot say, in the circumstances of this case, that it was clearly improbable that the defendant used these two handguns in connection with his cocaine trafficking conspiracy.2 First, both guns were handguns, which are more likely to be used in connection with a drug offense than long, hunting guns; second, while the guns were unloaded, the .44 was stored in a case with its ammunition; third, the guns were stored in close proximity to currency and drug paraphernalia; and fourth, while the weapons were stored under a pile of assorted junk, they were not so inaccessible as to make it clearly improbable that they had been used in connection with Drozdowski's

drug offense.

We are buttressed in this last conclusion by cases from a number of other Courts of Appeals that have rejected an argument that because a gun was not immediately accessible, it was clearly improbable that the weapon was being used in conjunction with a drug offense. For example, in United States v. Durrive, 902 F. 2d 1221 (7th Cir. 1990) the Seventh Circuit upheld a two-level weapons enhancement in a case in which the loaded weapon was stored in a closet, a location the court described as "inaccessible to strangers and casual visitors but readily

_____

2. We would not go so far as to say that inaccessibility is never enough to show that it is clearly improbable that a weapon is being used in conjunction with a drug crime. A truly inaccessible weapon, especially one not stored near any drug paraphernalia, would present a different case from the one before us.

7

accessible to [the defendant]." Id. at 1232. In United States v. Ewing, 979 F. 2d 1234 (7th Cir. 1992), the court upheld a weapons enhancement for a defendant who kept a pistol inside a locked box, along with his wallet, a quantity of cocaine, and notebooks recording drug transactions. The defendant had the key to the box in his pocket when he was arrested. The court affirmed the weapons enhancement despite the fact that the gun was unloaded and stored in the locked box. Id. at 1238. Similarly, in United States v. McGhee, 882 F. 2d 1095 (6th Cir. 1989), a search of the defendant's house uncovered eight rifles hidden in a secret compartment in the floor under the living room couch, six handguns in a secret compartment in the living room wall, and a .38 caliber pistol in a safe in the bedroom. The court held that while the defendant's firearms "were hidden in such a way as to be inaccessible to a stranger or casual visitor, they would be readily accessible to anyone who knew their location." Id. at 1099.

Because we find that it was not clearly improbable that the guns the police discovered at Drozdowski's father's house were connected with the drug activity, we affirm the District Court's application of the two-level enhancement pursuant to U.S.S.G. S 2D1.1.(b)(1). As we find no other error, the judgment of the District Court will be affirmed.3

_____

3. In addition to the S 2D1.1.(b)(1) issue, Drozdowski raises a number of other arguments on appeal, none of which has any merit.

First, Drozdowski asserts that the District Court erred by allowing into evidence statements made by Jose "Pete" Hidalgo, arguing that the statements were inadmissible hearsay and that they violated Drozdowski's Sixth Amendment right to confront witnesses. Hidalgo had been indicted in the same conspiracy as Drozdowski and the Government's evidence had shown that Hidalgo had supplied cocaine to Drozdowski on several occasions. Hidalgo fled before his trial. There are

four statements at issue: (1) statements made during a telephone call between Hidalgo and Drozdowski on July 25, 1999; (2) statements made to Trooper James Hischar during a traffic stop on July 27, 1999; (3) statements made by Hidalgo while recording a message on the defendant's answering machine on July 27, 1999; and (4) statements made during a telephone conversation with Drozdowski on July 27, 1999. We review for clear error, United States v. Vega, 285 F. 3d 256, 264 (3rd Cir. 2002).

8

Drozdowski urges that Hidalgo's statements do not qualify for a hearsay exception under Federal Rule of Evidence 801(d)(2)(E) because there was no evidence that they were made during or in furtherance of the conspiracy to sell cocaine. F.R.E. 801(d)(2)(E) provides that "a statement by a co-conspirator of a party during the course of the conspiracy" is not hearsay as to that party if four requirements are met: "(1) that a conspiracy existed; (2) the declarant and the party against whom the statement is offered were members of the conspiracy; (3) the statement was made in the course of the conspiracy; and (4) the statement was made in furtherance of the conspiracy. The district court must be able to find these requirements by a preponderance of the evidence." United States v. McGlory, 968 F. 2d 309, 333 (3d Cir. 1992), (citing Bourjaily v. United States, 483 U.S. 171, 175 (1987)). Because we are satisfied that all of the statements at issue were made both during and in furtherance of the conspiracy, we agree with the District Court that Hidalgo's statements qualify for a hearsay exception under F.R.E. 801(d)(2)(E). The Government was able to show, by a preponderance of the evidence, that (1) the July 25, 1999 phone call was used to set up a meeting at which Drozdowski would give Hidalgo money with which to purchase cocaine; that (2) Hidalgo's statements to Trooper Hischar after he had been pulled over, including that the cash he was carrying was the proceeds from the sale of a car, were an effort to cover up the conspiracy; and that (3) the last two phone calls were to inform Drozdowski that the money had been seized and to concoct a plan to get the money back.

We also reject the contention that the admission of Hidalgo's statements violated the Confrontation Clause of the Sixth Amendment of the U.S. Constitution. The Supreme Court has made it clear that co-conspirator declarations admissible under F.R.E. 801(d)(2)(E) do not violate the Confrontation Clause. Bourjaily 483 U.S. at 182-83. Therefore, the District Court did not err in admitting Hidalgo's statements into evidence.

Second, we find no merit in Drozdowski's contention that the District Court abused its discretion by refusing to give the "absent witness" charge he requested. The "absent witness" jury instruction is to be given in a case where the government fails to produce evidence, and the instruction tells the jury that the failure to produce this evidence creates a presumption that the evidence would be favorable to the defendant. See Graves v. United States, 150 U.S. 118, 120-21 (1893). Drozdowski asked for this instruction in relation to Jose Hidalgo, who was also indicted in the conspiracy, but had been released on bail, cut off his surveillance bracelet, and fled. A defendant is entitled to an absent

witness instruction when the testimony of a witness can only be produced by the Government. United States v. Luvene, 245 F.3d 651, 655 (8th Cir. 2001). Here, however, the Government could not produce Hidalgo: an active investigation by the U.S. Marshal's service had been unsuccessful in bringing him in. Because neither party could produce Hidalgo, an absent witness instruction was inappropriate.

Third, Drozdowski's argument that the District Judge erred in his jury instructions by stating that the defendant had an obligation to testify has no merit: Judge Kosik gave a correct instruction. Drozdowski asserted that the Judge instructed the jury that"the Defendant did not elect to testify, and the Defendant didn't testimony (sic), and under our Constitution, the Defendant has an obligation to testify."(emphasis in original.) Appellant's Brief at 26-27. The Government urged that the Judge actually instructed the jury that "the Defendant did not elect to testify, and the Defendant didn't testify, and under our Constitution the defendant has no obligation to testify or to present any other evidence. . . ." (emphasis in original) Appellee's Brief at 24. The audiotape of the charge bears out the Government's version and also shows that Judge Kosik went on to admonish the jury in some detail that Drozdowski's choice not to testify could not be held against him.

Finally, we disagree with Drozdowski's argument that the District Court erred in declining to depart downward under 18 U.S.C. S 3553(b) and U.S.S.G. S 5K.0 when the disparity between Drozdowski's sentence and those of his co-defendants was due to allegedly improper charging decisions by the Government. Drozdowski relies heavily on United States v. Contreras-Gomez, 991 F. Supp. 1242 (E.D. Wash. 1998), for the proposition that the Government's conduct in negotiating pleas may in some circumstances amount to improper sentencing manipulation and in such a situation a downward departure is warranted. Contreras-Gomez was a very different case from this one, however. In that case, the defendant was charged under 8 U.S.C. S 1362(b), which carries a maximum penalty of 20 years, while every other similarly situated defendant was charged under S 1362(b)(1), which caps the sentence at two years. Here, the government charged most of the co-defendants with the same offense as the defendant: conspiracy to distribute and possess with intent to distribute in excess of 5 kilograms of cocaine. While Drozdowski's co-conspirators pled to lesser amounts of cocaine than Drozdowski was charged with, and some were not assessed additional offense levels for a leadership role in the conspiracy, or for use of a gun, none of this requires a downward departure.

10

Art ART TIF  W=02480  D=03000
            ID=thpix1.tif

11

ART TIF  W=02700  D=02940
            ID=thpix2.tif

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit

12