**UNITED STATES of America**

v.

**David LEE, Appellant.**

**United States of America**

v.

**Teddy Young, a/k/a T. Turan Young,**

**Teddy Young, Appellant.**

**United States of America**

v.

**Theodore Young, Sr. a/k/a Curly,**

**Theodore Young, Appellant.**

**Nos. 07–3985, 07–4642, 07–4687.**

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit LAR 34.1(a) March 12, 2009.

Filed: July 27, 2009.

Daniel A. Velez, Esq., Robert A. Zauzmer, Esq., Office of United States Attorney, Philadelphia, PA, for United States of America.

Robert K. Kalmbach, Esq., Kennett Square, PA, for Appellant.

Before: FUENTES, CHAGARES, and TASHIMA *, Circuit Judges.

## OPINION OF THE COURT

CHAGARES, Circuit Judge.

Defendants David Lee, Teddy Young, and Theodore Young, Sr., appeal from their convictions and sentences for their respective roles in a conspiracy to distribute heroin from approximately November 17, 2000 to June 6, 2002. We will affirm.

---

* The Honorable A. Wallace Tashima, Senior Circuit Judge, United States Court of Appeals for the Ninth Circuit, sitting by designation.

## I.

Because we write solely for the parties, we recite only those facts essential to our determination.

Beginning on approximately November 17, 2000 through approximately June 6, 2002, Teddy Young was the leader of a heroin distribution organization.[1] Young and his co-conspirators, including his father, Theodore Young, Sr., received bulk heroin from sources in New York City and other places, and cut, processed, packaged, and stamped the heroin into bundles for resale in Philadelphia. As the leader of the organization, Young directed the activities of the sellers and cuthouse workers. David Lee was a street reseller for the YHO. Lee sold bundled heroin obtained from the YHO to an undercover police officer on seven occasions from November 17, 2000 to March 29, 2001. Lee also assisted the YHO in creating brand names to stamp on the bundled heroin for redistribution in the streets. The YHO processed heroin at two principal locations in Philadelphia, one at 5302 Wayne Avenue (the Wayne Avenue cuthouse) and one at 7665 Washington Lane (the Washington Lane cuthouse).

Authorities began an investigation into Young and the YHO in 1999, after a cooperating witness brought information to the FBI. As part of the investigation, the FBI instructed Marlon Gocking, a confidential informant, to meet with Young, with Gocking representing himself as a Ghanian heroin distributor. During this meeting, which the FBI recorded, Young stated that he sold "dope," and that he distributed almost "one brick" of heroin per week.[2] After further investigation, FBI Special Agent Robert M. Parks sought a court order authorizing a wiretap of Young's cellular phone. On September 5, 2001, the court authorized the initial wiretap for interception of electronic communications, pursuant to 18 U.S.C. § 2516(3). The order was extended several times, until June 8, 2002. On June 6, 2002, based on information obtained through the investigation, including the wiretaps, authorities sought and received ten warrants to search, among other locations, Young's residence, Young Sr.'s residence, the Wayne Avenue cuthouse, and the Washington Lane cuthouse.

On February 2, 2005, a federal grand jury returned a 35–count indictment charging Lee, Young, and Young, Sr. (collectively, "Appellants"), along with 16 others, with a variety of drug trafficking-related offenses. The indictment was unsealed on February 4, 2005, and the majority of those charged were arrested.

Each of the appellants was charged in Count 1, a two-object conspiracy, lasting from approximately November 17, 2000, to approximately June 6, 2002. Appellants were charged with conspiracy to distribute more than one kilogram of heroin and with conspiracy to distribute heroin within 1,000 feet of a school. Individually, each of the appellants was charged with additional counts. Young was also charged in Counts 10–25, 28, and 29 with use of a communication device to further drug trafficking, in violation of 21 U.S.C. § 843(b); in Count 30 with possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c)(1); and in Count 31 with possession of more than 100 grams of heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1) and (b)(1).

Young, Sr. was charged in Count 12 with use of a communication device to further

---

1. The heroin distribution organization is referred to in the Indictment as the Young Heroin Organization, or "YHO."

2. Gocking was deported approximately one year prior to the commencement of trial.

drug trafficking, in violation of 21 U.S.C. § 843(b); and in Count 32 with possession of heroin with intent to distribute, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C). Lee was charged in Counts 2 through 8 with distribution of heroin, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); and in Count 28 with use of a communication device to further drug trafficking, in violation of 21 U.S.C. § 843(b).

On April 10, 2006, prior to trial, Young filed a motion to suppress all physical and electronic evidence seized as a result of the wiretaps and search warrants, arguing that the affidavits failed to establish sufficient "necessity" to warrant the wiretaps. Young further moved to suppress any statements made during the search of his residence. Young, Sr. and Lee joined in Young's motions. On August 16, 2006, 2006 WL 2338259, following a hearing, the District Court denied all of the motions to suppress.

Trial commenced on April 9, 2007. Before proceedings began, the District Court held a hearing outside the presence of the jury regarding Young's motion to suppress evidence based on the warrantless seizure of his vehicle, and his motion to preclude the Government from playing the May 25, 2000 recording between Gocking, the confidential informant, and Young. The District Court denied both motions. On May 3, 2007, a jury convicted Appellants on all remaining counts,[3] with exception of Counts 20, 22, and 30, of which Young was acquitted. On October 1, 2007, Lee was sentenced to 300 months of incarceration and 10 years of supervised release, in addition to a fine and special assessment. On December 6, 2007, Young was sentenced to life imprisonment and 10 years of supervised release, in addition to a fine and special assessment. Also on December 6,

2007, Young Sr. was sentenced to 144 months of imprisonment and 10 years of supervised release, in addition to a fine and special assessment.

The appellants were each remanded after trial, and now appeal from their judgments and sentences. The District Court had subject matter jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We will affirm.

## II.

Young and Young Sr. appeal a number of the District Court's evidentiary rulings. Each is without merit.

### A.

■ First, Young and Young Sr. argue that the District Court erred in denying Young's motion to suppress evidence obtained as a result of the wiretap on the ground that the Government's affidavit failed to establish necessity. We review the District Court's determination of necessity in an application for a wiretap for abuse of discretion. *United States v. Phillips*, 959 F.2d 1187, 1189 (3d Cir.1992).

An application for an order authorizing a wiretap must contain, in relevant part, "a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(1)(c). However, "courts have consistently held" that the statute "does not require the government to exhaust all other investigative procedures before resorting to electronic surveillance." *United States v. Williams*, 124 F.3d 411, 418 (3d Cir.1997). Rather, "[t]he government

---

**3.** At the conclusion of the Government's case, on the Government's motion, the District Court dismissed Count 10, which charged Young with use of a communications device in furtherance of drug trafficking.

need only lay a 'factual predicate' sufficient to inform the judge why other methods of investigation are not sufficient." *Id.* (quoting *United States v. McGlory,* 968 F.2d 309, 345 (3d Cir.1992)). In *Williams,* we stated that "the inadequacy of other investigative techniques has been proven by demonstrating such factors as the inability of a confidential informant to gather additional information," as well as "the use of evasive tactics by the investigation's targets," and "the difficulty in penetrating an organization with a secretive nature and a propensity towards violence." *Id.* at 418.

The District Court determined that the affidavit demonstrated sufficient necessity, noting that the government detailed each of the investigative techniques and steps it had already attempted, such as the use of undercover police officers, the use of confidential informants, and the use of pen registers and trap and trace devices. As the District Court found "[f]ar from being boilerplate language, the affidavit discussed the particulars of each investigative procedure as it related to this case, as well as its limitations." In addition, the affidavit detailed other investigative steps, and explained why those steps were not reasonably likely to further the investigation. The District Court noted that, while "some critical information had been obtained using traditional investigative methods," the wiretap "was necessary to fully identify co-conspirators and their roles," which, at the time of the application, remained unclear. The affidavit also detailed the inability of authorities, using traditional techniques, to identify the financial accounts information, the sources and supplies of heroin, and the location and disposition of illegally-obtained proceeds. As this Court held in *United States v. Armocida,* 515 F.2d 29 (3d Cir.1975), "it is unrealistic to require the termination of an investigation before the entire scope of the narcotics distribution network is uncovered and the identity of its participants learned." *Id.* at 38.

Here, the District Court acted well within its discretion in finding necessity in its authorization of the wiretap.

**B.**

█  Young next argues that the District Court erred in admitting into evidence at trial the May 25, 2000 consensual recording of a conversation between Young and Gocking, the confidential informant. In that recording, Young discussed his involvement in heroin distribution and sales, claiming that he "can sell a brick in a week" of "straight dope" and that his "whole income" derives from distribution of "dope." Supplemental Appendix at 6–7. Young makes clear in this conversation that "dope" refers to heroin, not cocaine or marijuana. The District Court admitted the recording into evidence, over Young's objections, under Federal Rule of Evidence 801(d)(2)(A). Young contends that the recording constitutes hearsay, is irrelevant because it was made prior to the conspiracy, and constitutes improper evidence of "other crimes" under Rule 404(b). Young further argues that the admission of the recording was unfairly prejudicial because the purpose of the recording was to establish Young's "propensity" to engage in drug trafficking. We review a district court's determination on the admissibility of evidence for abuse of discretion. *United States v. Serafini,* 233 F.3d 758, 768 n. 14 (3d Cir.2000).

As the District Court concluded, Young's statements on the recording were not hearsay because they constitute admissions of a party opponent. Gocking's statements were not offered for the truth of the matter asserted, but rather to provide context to Young's responses. *See United States v. Hendricks,* 395 F.3d 173, 183–84 (3d Cir.2005). In addition, the District Court did not err in finding the recording relevant or by admitting improper

propensity evidence. Under Rule 404(b), evidence of prior drug transactions is inadmissible propensity evidence if its purpose is to show that the defendant was more likely to have committed the current offense. *See United States v. Sampson*, 980 F.2d 883, 886 (3d Cir.1992). The recording included Young's own statement that he was involved in the distribution of heroin, and that his entire income was derived from "dope." From this admission, a jury could infer that Young intended to continue this activity during the time period of the alleged conspiracy, an inference other than character evidence, consistent with the theory of the Government's case. Such evidence is both relevant under Rule 402 and proper under Rule 404(b). *See id.* at 888. We conclude that the District Court did not abuse its discretion in admitting the recording of Young's conversation with the confidential informant.

### C.

■ Young and Young Sr. appeal the District Court's qualification of FBI Special Agent Parks as an expert witness with respect to specialized knowledge of drug distribution networks and narcotics trafficking. Young and Young Sr. argue that Agent Parks was wrongly qualified as an expert because "his expertise was merely to repeat information that unidentified others communicated to him," and not, as indicated by the advisory notes to Rule 702, based on his own "extensive experience" or "reliable methodology." We review for abuse of discretion the District Court's ruling as to the qualifications of Agent Parks and the reliability of his testimony. *United States v. Perez*, 280 F.3d 318, 341 (3d Cir.2002).

"An expert witness may be permitted to testify regarding 'scientific, technical, or other specialized knowledge' if it will 'assist the trier of fact to understand the evidence or to determine a fact in issue.' " *United States v. Mornan*, 413 F.3d 372,

380 (3d Cir.2005) (quoting Fed.R.Evid. 702). Under Rule 702, a witness may qualify as an expert if three requirements are satisfied: "(1) the testimony must be 'based upon sufficient facts or data'; (2) the testimony must be 'the product of reliable principles and methods'; and (3) the witness must have 'applied the principles and methods reliably to the facts of the case.' " *Mornan*, 413 F.3d at 380 (quoting Fed.R.Evid. 702). In cases not involving scientific testimony, courts must still serve the gatekeeping function described in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), but " 'the factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony.' " *Better Box Commc'ns Ltd. v. BB. Tech., Inc.*, 300 F.3d 325, 329 (3d Cir.2002) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)). In such cases "the relevant reliability concerns may focus upon personal knowledge or experience." *Id.*

This Court has held that specialized knowledge may derive from "practical experience as well as academic training and credentials," and has "interpreted the specialized knowledge requirement liberally." *Better Box*, 300 F.3d at 327–28. "At a minimum," however, "a proffered expert witness ... must possess skill or knowledge greater than the average layman...." *Id.* at 328.

This Court has previously stated that, "[i]n cases involving narcotics trafficking, courts have admitted a broad range of expert testimony concerning the 'modus operandi' of the drug trade." *United States v. McGlory*, 968 F.2d 309, 345 (3d Cir.1992). Although *McGlory* was decided prior to the Supreme Court's decision in

*Daubert,* 509 U.S. 579, 113 S.Ct. 2786, and the December 2000 amendment to Rule 702, "[i]n both versions [of Rule 702], the purpose of expert testimony is to assist the trier of facts to understand, evaluate, and decide complex evidential material." *Perez,* 280 F.3d at 341. We conclude that the District Court did not abuse its discretion in finding Agent Parks was qualified under Rule 702.

Parks, an FBI agent for over eleven years, testified that he received training in narcotics and drug distribution organizations, participated in over 100 narcotics investigations, over 100 related searches, and wiretaps covering thousands of conversations concerning drug activity, and that he debriefed numerous drug dealers and individuals involved with drug distribution. In addition, Agent Parks testified that he consulted manuals and guidelines issued by the Drug Enforcement Administration ("DEA") and the FBI to stay current. The District Court did not abuse its discretion in ruling that through such practical experience and training, Agent Parks gained specialized knowledge in the field of drug distribution networks and narcotics trafficking. That this was Agent Parks's first time testifying as an expert does not undermine those qualifications.

Agent Parks testified on aspects of drug trafficking in the Philadelphia area, none of which are common knowledge among lay persons serving as jurors. Among other points, Agent Parks testified regarding the manner in which heroin is typically packaged, bundled, stamped and sealed in the Philadelphia area, how many individual packets are in a bundle, and how those packets and bundles of packets are usually priced. Specifically, Agent Parks testified that heroin typically costs between $70 and $90 dollars per gram, and that, based on his conversations with the DEA lab, the amount of heroin in a bag generally varies from .03–.05 grams, resulting in an average of .04 grams. Agent Parks further testified that resellers typically purchased heroin in bundled format, as opposed to individual packets. In addition, Agent Parks testified to some of the common names for heroin in the Philadelphia area, including "dope" and "H." Agent Parks also testified concerning the relationship between resellers and suppliers, explaining that money may be paid to the supplier up-front, at first, but that the reseller may be "fronted" the heroin once trust is established between the two. We conclude that Agent Parks's testimony was both helpful and relevant, and that it meets the threshold of Rule 702. *See id.* 280 F.3d at 341–42 (observing that several courts of appeals have consistently admitted testimony concerning the modus operandi of drug trafficking); *see also United States v. Figueroa–Lopez,* 125 F.3d 1241, 1244–45 (9th Cir.1997).

Young and Young Sr. specifically challenge aspects of Agent Parks's testimony learned "through conversations with the DEA lab." Young and Young Sr. failed to object to this portion of Agent Parks's testimony on the record. Moreover, Agent Parks was entitled to rely on information learned during the course of his experience in the field from others, including from individuals in the DEA lab. "If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion to be admitted." Fed.R.Evid. 703. In addition, we have held that Rule 703 "permits experts to rely on hearsay so long as that hearsay is the kind normally employed by experts in the field." *In re TMI Litig.,* 193 F.3d 613, 697 (3d Cir.1999). We conclude that the District Court did not abuse its discretion in accepting Agent Parks as an expert, and in admitting his testimony.

Young and Young Sr. additionally challenge as unreliable the District Court's admission of DEA forensic chemist Stacy Turner's expert testimony.[4] After Turner was accepted as an expert, she testified, and was cross-examined on, the scientific methods and techniques used in testing the seized substances, which included the use of composite mixtures and sampling to identify and weigh the substances. Young objected to this testimony, arguing that Turner's expert opinion concerning portions of the seized substances that did not undergo testing constituted "educated guess[es]," and thus did not reach "the level of reliability [required] of an expert witness." *Id.* at 649–50. The District Court denied Young's motion to strike any portion of Turner's testimony, finding the scientific techniques employed by Turner in the lab "are widely used in the scientific community" and that no evidence was presented, or elicited on cross-examination, suggesting otherwise. The District Court concluded that Young's arguments concerning the reliability of Turner's ultimate conclusions on the weight and identity of the untested portions of the seized substances went to the weight of the evidence, not to its admissibility. *Id.* at 651–52.

We have previously affirmed the admissibility of expert testimony based on similar sampling methodology. *See, e.g., United States v. McCutchen,* 992 F.2d 22, 25–26 (3d Cir.1993); *see also United States v. Fitzgerald,* 89 F.3d 218, 223 n. 5 (5th Cir. 1996) ("Random sampling is generally accepted as a method of identifying the entire substance whose quantity has been measured."). The admission of such testimony is consistent with *Daubert* when the methodology used by the expert is consis-

tent with that widely used in her scientific field. As the Supreme Court held in *Daubert,* "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 596, 113 S.Ct. 2786. We conclude that the District Court properly exercised its discretion in admitting Turner's testimony regarding her extrapolation of the weight and identity of narcotics in the seized substances.

#### D.

Young and Young Sr. next argue that the District Court erred in permitting Dominic Bellizzie, an employee of the U.S. Attorney's Office, to testify as a lay witness that the Wayne Avenue cuthouse and Young's residence were within 1,000 feet of a public school. Bellizzie testified that he formed this conclusion after examining a map prepared using a GPS computer program. The District Court did not err in allowing Bellizzie to testify as a lay witness. The distinction between lay and expert testimony is that lay testimony " 'result[s] from a process of reasoning familiar in everyday life,' " while expert testimony results from " 'a process of reasoning' " that " 'can be mastered only by specialists in the field.' " *Donlin v. Philips Lighting N. Am. Corp.,* 564 F.3d 207, 214–15 (3d Cir.2009) (quoting Fed.R.Evid. 701 advisory committee's note (2000 amendments)). Bellizzie's use of a GPS navigation program relies on a tool used in everyday life, and requires no specialized training or knowledge. Bellizzie's testimony is "rationally based on the perception of a wit-

---

**4.** None of the appellants objected to Turner's qualifications during voir dire. Young Appendix (Young App.) 573. We review any argument on Turner's qualifications as an expert in the field of forensic chemistry and the identification of controlled substances for plain error, *United States v. Pungitore,* 910 F.2d 1084, 1148 (3d Cir.1990), and find none here.

ness," as required by Federal Rule of Evidence 701(a). We thus conclude that the District Court did not abuse its discretion.

### E.

Young Sr. makes three additional arguments that evidence was improperly admitted by the District Court. First, he argues that the District Court erroneously admitted the Government's chart summarizing the YHO organization (Gov't Ex. 905) into evidence. Young Sr. claims that the photographs used in the exhibit looked like "mug shots," were unduly prejudicial, and lacked foundation. We disagree. The charts were merely demonstrative, illustrating Agent Parks's testimony concerning the likely members of the YHO and the structure of the organization. Additional witnesses testified to the structure represented in the chart. The Court made this limited purpose clear in its cautionary instruction to the jury: "This is simply one piece of evidence offered to you to help to organize what this witness has testified to and what other witnesses will say. But, it is not in itself evidence of a conspiracy, or evidence of the relative roles of persons in the conspiracy." The District Court properly exercised its discretion in admitting the chart. That the photographs of defendants were larger relative to photographs of other possible co-conspirators does not change this result. The District Court cautioned the jury not to draw any inferences based on the relative size of the photographs, and, again, that the chart was not evidence of a conspiracy, but rather illustrative of the witnesses' testimony.

Young Sr. also contends that the District Court erred in permitting the Government's cooperating witness, Steven Scott, to testify regarding his relationship in the drug trade with Young and Young Sr., starting in early 2000 or 2001, because this testimony may have concerned events that predated the charged conspiracy, which began on or about November 19, 2000.

Young Sr. argues that Scott's testimony constituted inadmissible propensity evidence under Rule 404(b). We review the admission of Scott's testimony for abuse of discretion. *Serafini*, 233 F.3d at 769 n. 14.

As this Court held in *United States v. Gibbs*, 190 F.3d 188 (3d Cir.1999), Rule 404(b) does not apply to "evidence of uncharged offenses committed by a defendant when those acts are intrinsic to the proof of the charged offense," such as when those acts are "relevant to show the existence and nature of the conspiracy." *Id.* at 217–18. Scott testified that he packaged heroin for Young and Young Sr. at Young Sr.'s residence, and continued to do so once the operation was moved to the Wayne Avenue cuthouse sometime in 2001. Heroin, drug paraphernalia, and firearms were ultimately seized from Young Sr.'s residence at the end of the conspiracy. Scott's testimony, even if it expanded into a short time period prior to the charged conspiracy, demonstrated an unbroken pattern of activity involving Scott and the Youngs, continuing through the time of the charged conspiracy. These acts were inextricably intertwined with the YHO heroin distribution scheme and ongoing criminal enterprise, and were offered as direct proof of the charged conspiracy. We thus conclude that the District Court did not abuse its discretion in admitting Scott's testimony.

Finally, Young Sr. argues that the District Court abused its discretion in admitting the testimony of FBI Special Agent Mario Campana regarding the location of items seized from Young Sr.'s residence because Campana "lacked sufficient personal knowledge of where the items were found," in violation of Federal Rules of Evidence 602 and 801. Young Sr.'s argument is without merit. Campana led the team conducting the search of Young Sr.'s residence. His testimony concerned his ob-

servations on the team as team leader, including his directions as to where agents were stationed, what each agent turned over to him, and what he did with the seized items, such as bundles of heroin. He did not testify to statements made to him by other agents. In addition, much of Campana's testimony was based on the photographs of the items taken at the location where they were recovered, and that the photographs fairly and accurately represented what he saw on the day of the search. This testimony satisfied the requirements of Rules 602 and 801. The District Court allowed Campana, as the team leader to "testify as to what was found" at the residence, but provided defense counsel with the opportunity to cross-examine the witness "as to what specifically he knows and specifically where it was found, if he knows." Defense counsel chose not to do so. The District Court did not abuse its discretion in admitting Campana's testimony regarding the location of the items seized at Young Sr.'s residence.

### III.

Young and Young Sr. challenge the District Court's jury charge regarding the determination of the quantity of heroin distributed as part of the conspiracy. The Court stated:

I will give you special interrogatories that are questions on the verdict sheet

as to the amounts of heroin. The issue of drug quantity arises only as a secondary question. In the event that you find any of the defendants guilty of Count 1, and or if you find Teddy Young Jr. guilty of count 31.

If you find a defendant guilty of Count 1 you must then respond to a question called a jury interrogatory to decide whether the crime involved certain quantities of heroin, which are referred to in the criminal statute.

The Youngs contend, apparently for the first time on appeal[5], that the District Court failed to instruct the jury that drug quantity was an element of the offense that had to be proven by a reasonable doubt, and that the Court's phrase "secondary question" led the jury to believe that drug quantity was "not as important" as the other elements of the offense. The Court's instructions were consistent with *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Although the jury must treat a fact that would increase the statutory maximum, such as drug quantity under 21 U.S.C. § 841(b), as the "functional equivalent" of an element of the offense, failure to prove that the conspiracy involved one kilogram or more of the narcotics would not require a finding of "not guilty." Rather, the underlying offense—distribution of narcotics or possession with intent to distribute—

**5.** In the first portion of the jury charge, the District Court stated that, in order to find the defendants guilty of Count 1, a conspiracy to distribute more than one kilogram of heroin and with conspiracy to distribute heroin within 1,000 feet of a school, "you need only find that [defendants] conspired to distribute a measurable amount of a mixture or substance containing a detectible amount of heroin. The quantity or quality, in terms of purity is immaterial." Young App. 729. The Court made a similar statement with respect to Count 31. *Id.* at 729–30. The Court continued, "I will give you special interrogatories that are questions on the verdict sheet as to

the amounts of heroin. The issue of drug quantity arises only as a secondary question. In the event that you find any of the defendants guilty of Count 1, and or if you find Teddy Young Jr. guilty of Count 31." *Id.* at 730. After these instructions, defense counsel vaguely objected that, with respect to drug quantity, "I don't think that you included the whole thing about the weight." *Id.* at 735. The Court responded that it would review quantity in the special interrogatories. *Id.* When it did so, as discussed above, defense counsel did not object to the Court's jury charge, or special interrogatories, with respect to the phrase "secondary question."

would remain a lesser included offense. *See United States v. Lacy,* 446 F.3d 448, 454–55 (3d Cir.2006). The District Court neither abused its discretion, nor committed plain error,[6] in providing this instruction to the jury.

## IV.

Appellants next appeal their sentences. This Court exercises plenary review of a district court's interpretation of the Sentencing Guidelines, and reviews factual findings for clear error. *United States v. Grier,* 475 F.3d 556, 570 (3d Cir.2007) (en banc). We review claims of error not preserved by objection at sentencing for plain error. *United States v. Bernard,* 373 F.3d 339, 341 (3d Cir.2004).

Lee argues, in his only issue presented on appeal, that the District Court violated *Apprendi* in finding for sentencing purposes, by a preponderance of the evidence, that the amount of heroin involved in the conspiracy was 24.96 kilograms.[7] He contends that under *Apprendi,* any fact, other than criminal history, that increases a statutory maximum sentence must be proven to a jury beyond a reasonable doubt, and that the same rule should apply with respect to the sentencing guidelines. This argument, however, is foreclosed by *United States v. Booker,* 543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), and this Court's subsequent decision in *Grier,* 475 F.3d at 565 ("There can be no question, in light of the holding of *Booker* and the reasoning of *Apprendi,* that the right to proof beyond a reasonable doubt does not

apply to facts relevant to enhancements under an advisory Guidelines regime.").

Young and Young Sr. also object to their sentencing determinations. Young objects to the application of a two-level enhancement for possession of a firearm, the assessment of a two-level enhancement for distribution of heroin with 1000 feet of a school zone, and the quantity calculation. Young Sr. adopts Young's argument concerning drug quantity.

## A.

■ Section 2D1.1(b)(1) of the Sentencing Guidelines provides for an increase in a defendant's offense level if the defendant possessed a firearm in the course of a drug trafficking offense. Recognizing the "increased danger of violence when drug traffickers possess weapons," note 3 of the commentary to this provision provides that the "adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1(b)(1) cmt. n. 3.

Young first argues that it was "clearly improbable" that the firearm was connected with the offense because "there was no use of the firearm." As noted by this Court, "defendants have rarely been able to overcome the 'clearly improbable' hurdle," *United States v. Drozdowski,* 313 F.3d 819, 822–23 (3d Cir.2002), and Young cannot do so now. In *Drozdowski,* we identified several variables relevant to this determination, a number of which militate in favor of the enhancement here. First,

---

**6.** To the extent the Youngs failed to object to this portion of the jury instructions, we review the instructions for plain error. *United States v. Antico,* 275 F.3d 245, 265 (3d Cir. 2001). The Youngs have failed to establish plain error on appeal.

**7.** The pre-sentencing report for Lee proposed a guidelines sentence based on a conspiracy

to distribute 24.96 kilograms of heroin. At his sentencing hearing, Lee objected to this quantity calculation, arguing that the jury had convicted him of a conspiracy to distribute more than one kilogram of cocaine, but had made no additional quantity findings beyond a reasonable doubt.

the guns recovered during the investigation were handguns, which, as noted by this Court, are "tool[s] of the drug trade," because they are "easy to conceal yet deadly." *Id.* at 822 (quotation marks and brackets omitted). Second, the guns were stored near heroin and drug paraphernalia. *See id.* at 822–23. Heroin was found in Young's residence, where two guns were recovered, and at Young Sr.'s residence, where a handgun and shotgun were found. Third, Young's guns were located under his bed and in his car, together with bundled heroin ready for street sale. We cannot conclude on this evidence that it was "clearly improbable" that the firearms were connected to the conspiracy. *See id.* at 823 (noting that, "this conspiracy lasted several years and we are convinced that it is not clearly improbable that at some point during those years, these guns, found so close to the drug money and the owe sheets, were used in conjunction with the drug activity").

Young next argues that the District Court's enhancement was contrary to the jury verdict because Young was acquitted of Count 30, charging him with possession of a firearm in connection with drug trafficking. This contention is without merit. The District Court may consider acquitted conduct in making its guidelines calculations. *United States v. Jimenez,* 513 F.3d 62, 88 (3d Cir.2008). In addition, the court may impose a sentencing enhancement based on that conduct if it finds that the conduct has been proved by a preponderance of the evidence. *United States v. Watts,* 519 U.S. 148, 157 & n. 2, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (per curiam). The District Court properly found, by a preponderance of the evidence, that Young possessed the firearms subject to the acquitted charge; its consideration of that conduct in imposing the sentencing enhancement was not contrary to the jury verdict.

Finally, Young contends that 18 U.S.C. § 924(c)(1) fixes a mandatory maximum sentence of 60 months for possession of a firearm during and in relation to, or in furtherance of, a drug-trafficking crime, and that the District Court erred in imposing a higher term under the sentencing guidelines. Young misreads the statute, which calls for a term of imprisonment "of not *less* than 5 years." 18 U.S.C. § 924(c)(1) (emphasis added); *see also United States v. Williams,* 464 F.3d 443, 449 (3d Cir.2006). As there is no conflict between the sentence imposed and the statute, Young has failed to show any error in the District Court's application of the enhancement under § 2D1.1.

**B.**

Young also appeals the District Court's two-level enhancement under U.S.S.G. § 2D1.2(a)(1) for distribution of heroin within 1,000 feet of a school zone, which resulted in an offense level of 44. Young contends on appeal that the District Court erred in adding two levels "as if all the drugs were distributed near a protected location," when the jury did not make a finding of drug quantity distributed in proximity to the school zone. Because Young did not object at sentencing, we review for plain error.

The District Court determined, by a preponderance of the evidence, that the amount of heroin involved in the conspiracy was 24.96 kilograms. The District Court did not make an explicit determination under § 2D1.2(a)(1) of the quantity of controlled substances directly involving the protected location. The Government argues that the District Court made an "implicit" finding as to the quantity of drugs directly involving the school zone because the evidence established that the two locations primarily involved in the packaging and distribution of heroin, the Wayne Ave-

nue cuthouse and Young's residence, were each within 1,000 feet of a public school.

We conclude that the District Court's failure to make a specific finding of quantity "directly involving" the school zone did not constitute plain error because Young would face the same sentence. Under U.S.S.G. § 2D1.2(a)(1), one level would have been added for "the total quantity of controlled substances involved in the offense," which would have resulted in an offense level of 43, rather than 44. The highest offense level under the guidelines is 43, life imprisonment. As such, omission of the explicit finding did not affect the guidelines calculation. We conclude that the District Court's application of the sentencing enhancement was not clearly erroneous, much less plain error.

### C.

Finally, Young and Young Sr. appeal the District Court's finding, by a preponderance of the evidence, that they distributed, as part of the conspiracy, 24.9 kilograms of heroin, because that finding was based on unreliable evidence, namely, Agent Parks's testimony. The Youngs' argument is without merit. At sentencing, the Government reviewed the evidence that led Agent Parks to this figure. That evidence included direct testimony from the cuthouse workers that packaged the heroin concerning the number of bags of heroin packaged per day, and the number of days per week worked, during the course of the approximately 80–week conspiracy. It also included evidence, drawn from the DEA lab, of the average number of grams of heroin contained within each bag in a bundle. This estimate was corroborated by Turner's testimony and her reports. We conclude that the evidence possessed sufficient indicia of reliability, and the District Court did not err in relying on the evidence provided by Agent Parks, Turner, and the cooperating witnesses in determining, by a preponderance of the evidence, the quantity of heroin distributed during the conspiracy.

### V.

For the foregoing reasons, we will affirm the decision of the District Court.