PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 13-1863 & 13-1936
_____

UNITED STATES OF AMERICA,
                    Appellant in No. 13-1936

v.

RAYMOND A. NAPOLITAN,
                    Appellant in No. 13-1863


_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
District Court  No. 2-11-cr-00146-001
District Judge: The Honorable Arthur J. Schwab

Appeal No. 13-1863 Submitted under Third Circuit LAR
34.1 (a) on May 14, 2014

Appeal No. 13-1936 Argued on May 14, 2014

Before: SMITH, VANASKIE, and SHWARTZ,
*Circuit Judges*

1

(Filed: August 6, 2014)

Rebecca R. Haywood
Donovan Cocas [ARGUED]
Office of United States Attorney
700 Grant Street
Suite 4000
Pittsburgh, PA 15219
          *Counsel for United States of America*

Lisa B. Freeland
Renee Pietropaolo [ARGUED]
1500 Liberty Center
1001 Liberty Avenue
Pittsburgh, PA 15222
          *Counsel for Raymond Napolitan*

_____

OPINION

_____

SMITH, *Circuit Judge.*

Raymond Napolitan was convicted in the United States District Court for the Western District of Pennsylvania of possession with intent to distribute 500 grams or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii). He was subsequently sentenced to a term of imprisonment of 78 months, which the District Court ordered to run consecutively with a sentence Napolitan was already

2

serving on a separate state offense. Napolitan appeals his conviction, arguing that a new trial is warranted because two of the Government's witnesses testified falsely at trial. The Government cross-appeals from the judgment of sentence, arguing that the District Court erred in refusing to impose sentencing enhancements under U.S.S.G. §§ 2D1.1(b)(1) and 3C1.1. For the reasons expressed below, we will affirm Napolitan's conviction, but will vacate his sentence and remand for resentencing.

I.

On June 29, 2007, four police officers with the Southwest Mercer County Regional Police Department were dispatched to Napolitan's home in response to a 911 call. Although no one was at the home when the officers arrived, Lisa Rodemoyer—Napolitan's live-in girlfriend of seven years—arrived within a few minutes and invited the officers inside. Once inside, the officers discovered a loaded Browning .32 caliber handgun on the fireplace mantel. One of the officers cleared the weapon, then stepped into Napolitan's office to use the light from a desk lamp to read the serial number. There on the desk, the officer observed a box of sandwich baggies, a coffee grinder, a digital scale, and white powder residue. Suspecting drug activity, the officers departed Napolitan's home and obtained a search warrant.

In the search of the home that followed, the officers found a .22 caliber handgun sitting on top of a locked gun safe in a closet connected to the office. They also found a bag of Inositol, a cutting agent used by cocaine traffickers to dilute the drug. Unable to open the safe, investigators asked

3

Corporal John Rococi, who had a prior relationship with Napolitan, to call Napolitan and ask for the combination. Rococi reported back that, in response to his request, Napolitan stated: "If they get into that safe, I'm hit." App. 127. Napolitan declined to provide the combination to the safe so that investigators had to engage a locksmith to open it.

The safe contained a variety of firearms, including a .25 caliber Dickson Detective semi-automatic handgun, a .32 caliber Colt semi-automatic handgun, six shotguns, ten long rifles, and one black powder rifle. It also contained $9,235 in cash, Napolitan's checkbook, and a variety of painkillers prescribed for Napolitan. Most importantly, it contained nearly one kilogram of cocaine powder.

Napolitan was arrested a few days later and subsequently charged in a two-count indictment with possession with intent to distribute 500 grams or more of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and (b)(1)(B)(ii), and possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c). Napolitan chose to go to trial, and maintained that the drugs belonged to Rodemoyer. He took the stand in his own defense and admitted ownership of the safe and most of its other contents, but claimed that he did not know about the drugs. Although acknowledging that Rodemoyer did not know the combination to the safe, Napolitan claimed that she accessed it using a large skeleton key (between eight and twelve inches in length) which she had ordered directly from the manufacturer. Napolitan explained that Rodemoyer would insert this key into a slot that was revealed by unscrewing and removing the combination pad affixed to the front of the safe.

4

Napolitan's defense also included the testimony of a longtime friend, Scott Trepanosky, who testified to having heard rumors that Rodemoyer sold cocaine in the past and that he had seen Rodemoyer open the safe with a skeleton key.

Prosecutors did not have knowledge of Napolitan's allegations against Rodemoyer at the time she testified for the Government. As a witness in the Government's case-in-chief, she conceded that she had never seen Napolitan deal drugs. She did state, however, that she heard him talk on the phone in coded language and that she was sometimes asked to leave the house she shared with him or stay in a bedroom when people came to the house. On direct examination, Rodemoyer testified that she neither knew the combination to the safe nor had access to its contents. She affirmed this position on cross-examination, providing the following response which is relevant to this appeal:

Q:     Okay. And it is your testimony that you never had access to that safe?

A:     Correct.

App. 77. And Rodemoyer repeated this position on re-cross:

Q:     And again, you're telling us that you never went in that safe, and you couldn't have gotten in?

A:     No.

Q:     That's what your testimony was?

5

A:     Yes.

App. 82. Significantly, neither the prosecution nor the defense asked Rodemoyer whether she had ever possessed a skeleton key that could have been used to access the safe.

Among the various other witnesses for the Government was Sergeant Charles Rubano, who testified concerning the contents of the safe and other items recovered during the search of the home. Relevant for purposes of this appeal, Sergeant Rubano provided the following testimony about finding a skeleton key inside the safe:

Q:     And at some point did you find a key to that safe?

A:     Yeah. The key was inside the safe.

Q:     You found no other keys?

A:     Correct.

App. 93.

Throughout the trial, the Government belittled Napolitan's claim that Rodemoyer obtained her own key to the safe. During its cross-examination of Napolitan, the Government pointedly asked how it was that Rodemoyer accessed the safe with a skeleton key when no such key had been recovered outside the safe. App. 211–12. The Government also rebuffed Napolitan's "key theory" during its closing argument to the jury:

6

> Now, Mr. Napolitan said in his testimony that there were multiple keys. Did you see multiple keys here today? Did you see other keys to the safe that were possessed by Lisa or anyone else? This was a long skeleton type key. Clearly the police would have found and seized that.

App. 229.

The jury ultimately convicted Napolitan on count one, possession with intent to distribute more than 500 grams of cocaine. The jury did not consider the firearm charge in count two because the District Court granted Napolitan's Rule 29 motion for judgment of acquittal at the close of the Government's case-in-chief.[1]

The day before Napolitan was set to be sentenced, Rodemoyer contacted the prosecutor and informed him that, six to eight months before the drugs were discovered, she had in fact purchased a key to the safe from the manufacturer. The

---

[1] The District Court's invocation of Rule 29 to dismiss the firearms charge before the case went to the jury rendered its decision not appealable. *See United States v. Scott*, 437 U.S. 82, 91 (1978) ("A judgment of acquittal, whether based on a jury verdict of not guilty or on a ruling by the court that the evidence is insufficient to convict, may not be appealed and terminates the prosecution when a second trial would be necessitated by a reversal."). In an attempt to preserve the right of appeal, the Government asked the Court to hold its decision in abeyance until after count two was submitted to the jury. The Court denied this request. App. 177–78.

prosecutor immediately relayed this information to defense counsel. At the sentencing hearing, Rodemoyer testified that she had ordered the key because she had wanted to leave Napolitan—who was physically abusing her—but first needed to recover her driver's license, birth certificate, and Social Security card, all of which Napolitan kept locked in the safe. Rodemoyer claimed, however, that Napolitan found the key a few days later, punched her in the face, and took it away from her before she could use it. In response to defense counsel's questions, Rodemoyer explained that she did not inform the prosecutor about the key sooner because no one asked her at trial whether she herself had a key. Further, she explained that she was not alerted to the issue because she had not attended any aspect of the trial other than her own testimony and was thus not aware of Napolitan's allegation that she had accessed the safe with a key. App. 417–18.

Sergeant Rubano also testified at the sentencing hearing, revisiting his earlier trial testimony about the items discovered in the safe. Rubano reported that investigators had recovered two keys inside the safe:

Q: Other than the key found inside the safe, the key or keys found inside the safe, did you find any other keys?

A: No. Just the two keys.

Q: So there are two keys in the safe?

A: Special keys for opening safes, yes.

8

App. 430. Defense counsel asked Rubano whether he had testified at trial that only one key was recovered, but Rubano asserted that he did not remember making such a statement. He also stated that the two keys had not been noted on his inventory sheet because they were found after the initial search when investigators discovered a false bottom in the safe.

In light of the testimony offered at the hearing, the District Judge decided to have the parties brief any new issues, and he rescheduled the sentencing hearing for a later date. In the interim, Napolitan moved the Court to reconsider his previously filed Rule 29 motion for judgment of acquittal on count one. He argued that new facts discovered at the sentencing hearing—i.e., that Rodemoyer had ordered a key to the safe and that law enforcement had recovered two keys inside the safe—made it apparent that the prosecution had introduced false testimony at trial. Although the motion was cast as one under Rule 29, the District Court orally agreed to consider it also as one under Rule 33 (motion for new trial) and Rule 34 (motion for arrest of judgment). Concluding that the trial testimony was not inconsistent with the sentencing testimony, the Court denied the motions.

The presentence investigation report ("PSR") recommended imposing separate enhancements under U.S.S.G. § 2D1.1(b)(1), for possession of a firearm in connection with a drug offense, and under U.S.S.G. § 3C1.1, because Napolitan obstructed justice by testifying falsely at trial. With the inclusion of these enhancements, Napolitan's Guidelines range was 121 to 151 months.

The District Court, however, refused to apply § 2D1.1(b)(1)'s firearm enhancement, stating:

> I think the firearms are not the type of firearms that certainly are used by gun [sic] dealers. Having had two extensive gang/drug related cases over the last couple years . . . , these are not the type of firearms in my experience . . . that are used in connection with drug trafficking.

App. 404–05. The judge did not directly address the handguns in the safe or the .22 caliber pistol on top of the safe, and he only briefly mentioned the loaded Browning .32 caliber handgun discovered on the mantel, concluding that its presence did not require imposition of the enhancement because it "was not physically in the same room" and "was certainly not within a 'few feet' of the safe." App. 405. The Court also incorporated its opinion and statements regarding dismissal of the § 924(c) charge as an additional basis for rejecting the firearm enhancement, including the statement that Napolitan had "a constitutional right to carry a handgun that's legally owned by him around his house." App. 176, 405.

The District Court also refused to apply the obstruction of justice enhancement in § 3C1.1. The Court explained:

> I don't know that the record supports it, and I am concerned that it really has a chilling effect on a Defendant that provides a defense in the

10

> case, including taking the stand or putting witnesses on the stand.

App. 466. Beyond this statement, the Court did not provide any further explanation for his refusal to apply the enhancement.

Without the two enhancements, Napolitan's Sentencing Guidelines range dropped to between 78 and 97 months. The District Court sentenced Napolitan at the bottom of the range to 78 months in prison, and ordered that the federal sentence run consecutively with a state sentence he was already serving for sexually assaulting Rodemoyer.

These consolidated appeals timely followed.[2]

## II.

We first address the issues raised in Napolitan's appeal. Napolitan argues that a new trial is warranted because new evidence revealed at sentencing shows that his conviction was based on falsified testimony. Napolitan argues that Rodemoyer testified falsely when she claimed she never had access to the safe, and that Sergeant Rubano testified

---

[2] The District Court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction of this appeal pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(b).

11

falsely by suggesting he found only one key inside it. We disagree.[3]

Our court has identified five requirements that a defendant must satisfy before he will be granted a new trial on the basis of newly discovered evidence. The defendant must (1) identify newly discovered evidence; (2) allege facts from which his diligence can be inferred; (3) demonstrate the evidence is not merely cumulative or impeaching; (4) show the evidence is material to the issues involved; and (5) show the evidence is such that, if introduced at trial, it would probably produce an acquittal. *United States v. Kelly*, 539 F.3d 172, 181–82 (3d Cir. 2008). "Although the decision to grant or deny a motion for a new trial lies within the

---

[3] Napolitan also argues that the District Court abused its discretion when it ordered his federal sentence to run consecutively with a state sentence he was already serving. In announcing its decision to make the two sentences run consecutively, the District Court explained that its policy was to make "separate sentences run consecutively if they involve separate crimes." App. 473. Napolitan argues that the Court committed procedural error by basing its decision to impose a consecutive sentence on its sentencing practice, rather than on an individualized assessment of the factors set forth in 18 U.S.C. § 3553(a). This issue is rendered moot by our decision, discussed below, to vacate Napolitan's sentence based on an erroneous application of the Sentencing Guidelines. On remand, the District Court will have an opportunity to impose a consecutive sentence, if it so chooses, and should connect its decision to do so with its consideration of the § 3553(a) factors. *See* 18 U.S.C. § 3584(b).

discretion of the district court, the movant has a 'heavy burden' of proving each of these requirements." *Id.* (quoting *United States v. Cimera*, 459 F.3d 452, 458 (3d Cir. 2006)). "If just one of the requirements is not satisfied, a defendant's Rule 33 motion must fail." *Id.* (citing *United States v. Jasin*, 280 F.3d 355, 365 (3d Cir. 2002)).

We begin with Rodemoyer's testimony. The prosecutor's examination of Rodemoyer only briefly addressed her connection to the gun safe. He asked Rodemoyer whether she knew the combination to the safe or otherwise had access to it, to which she twice responded, "No." App. 70–71. Defense counsel's inquiry was equally limited, consisting of just two leading questions, which prompted Rodemoyer's agreement that she "never had access to [the] safe" and "never went in the safe, and . . . couldn't have gotten in." App. 77 & 82. Napolitan argues that these statements are inconsistent with Rodemoyer's testimony at the sentencing hearing. There, Rodemoyer admitted that she had purchased a key several months before the drugs were found but that Napolitan had beaten her and taken it away before she had been able to use it. App. 409–10.

As a preliminary matter, Napolitan cannot claim that Rodemoyer falsely denied ever having a key to the safe. At trial, the subject was simply not inquired into by either side. Neither the prosecution nor the defense asked Rodemoyer whether she possessed a key to the safe at the time the drugs were discovered or at any time prior to that. Defense counsel's failure to ask Rodemoyer about the key is noteworthy considering that the "key theory" was central to Napolitan's defense. *See United States v. Whiteford*, 676 F.3d

13

348, 361 n.11 (3d Cir. 2012) (noting that defendant arguably fell short of the diligence requirement in failing to cross-examine witness regarding the issue raised on appeal).

Without direct testimony concerning the key, these two sets of statements are inconsistent only if we conclude that Rodemoyer's brief possession of a key several months before the drugs were recovered conflicts with her statement at trial that she "never had access to the safe." We agree with the District Court that these statements are not necessarily inconsistent. Rodemoyer testified at the sentencing hearing that Napolitan beat her and forcefully seized the key not long after she obtained it and before she had an opportunity to use it. We accept this statement as true and have no reason to doubt Rodemoyer's subjective belief that she lacked access to the safe, even during the brief period when the key was in her possession. At the very least, there is simply not enough here for us to conclude that a jury presented with this testimony would have acquitted Napolitan of the charge. Indeed, even if evidence at sentencing had revealed that Rodemoyer had access to the safe at the time the drugs were discovered (which it did not), Napolitan could still have been convicted on a theory of constructive possession. It was undisputed that he had ready access to the safe and used it to store his belongings.

We are likewise not persuaded by Napolitan's assertion that Sergeant Rubano's trial testimony was false. The prosecutor asked Rubano two questions regarding the safe key. First, he asked whether Rubano found "a key" to the safe, to which Rubano responded, "Yeah. The key was inside the safe." App. 93. The prosecutor followed up by asking,

14

"You found no other keys?," to which Rubano responded, "Correct." *Id.* At sentencing, Rubano testified that his team recovered two skeleton keys on a single ring in a false bottom of the safe.

Although the prosecutor's questions during trial referred to "a key" in the singular, the record does not necessarily indicate that Rubano intended to take the position that only one key was found in the safe. Rubano may have understood the prosecutor to have been asking whether a key was recovered outside the safe (i.e., where Rodemoyer could have utilized it). A focus on *where* the key was found—as opposed to *how many* keys were found—is consistent with the point the Government pressed during summation, when it argued that if Rodemoyer had a key it would have been found outside the safe.

Yet even if Rubano's statements are inconsistent, such inconsistency does not equate to falsity that comes with the implication that the witness was deliberately withholding material information. Rather, this discrepancy was most likely due to Rubano's faulty memory on a point that had little consequence to the trial. Indeed, whether one key or two keys were recovered was immaterial. In either event, the keys were in the one place Rodemoyer could not get them: inside the safe. Furthermore, we again emphasize that defense counsel did not make a diligent effort to explore this issue with Rubano while he was on the stand, failing to ask even a single question regarding the number of keys found in the safe.

There were multiple avenues available for Napolitan to explore these issues during trial, most notably by asking

direct questions to Rubano and Rodemoyer regarding his theory that Rodemoyer possessed a key to the safe. Napolitan did not avail himself of these opportunities. Because he did not exercise diligence in exploring these matters during trial, Napolitan cannot now parse each word in the record in an attempt to gin up a claim of prosecutorial misconduct. We can find no support for Napolitan's claim that newly discovered evidence warrants a new trial. Napolitan's conviction will be affirmed.[4]

## III.

In its cross-appeal, the Government contends that the District Court erred by refusing to apply two sentencing enhancements recommended in the PSR: (1) an enhancement for possessing a firearm in connection with a drug offense under U.S.S.G. § 2D1.1 and (2) an enhancement for obstructing justice by committing perjury on the stand under U.S.S.G. § 3C1.1. Because we find procedural errors in the District Court's assessment of both of these enhancements,

---

[4] Napolitan also seeks a new trial under the Due Process Clause on the basis of alleged prosecutorial misconduct. Because Napolitan failed to preserve this argument, we review this claim for plain error. Napolitan cannot show that it was plain error not to grant a new trial because, among other things, he has not shown the Government knew or should have known that Rodemoyer or Rubano provided inaccurate, let alone perjurious, testimony.

we will vacate Napolitan's sentence and remand for resentencing.[5]

## A.

We begin by addressing the District Court's refusal to apply the firearm enhancement set forth in U.S.S.G. § 2D1.1(b)(1). We review a district court's factual determinations for clear error. *United States v. Drozdowski*, 313 F.3d 819, 822 (3d Cir. 2002). We find clear error if, when reviewing the entire record, we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Kulick*, 629 F.3d 165, 168 (3d Cir. 2010). We apply plenary review to a district court's interpretation of the Sentencing Guidelines. *United States v. Bethancourt*, 65 F.3d 1074, 1080 (3d Cir. 1995).

---

[5] After both parties filed their notices of appeal, the District Court *sua sponte* issued an amended judgment pursuant to Fed. R. Crim. P. 36. The amended judgment purported to make clerical modifications, but also removed language in the original judgment providing that Napolitan's federal sentence was to run consecutive to a state sentence he was already serving. The Government argues that removing this language constituted an impermissible substantive modification, and thus asks that we vacate the amended judgment and remand with instructions that the new judgment be brought into accord with the oral pronouncement of sentence. This issue is rendered moot by our decision to vacate the judgment on other grounds. On remand, the District Court is instructed to ensure that the written judgment is consistent with the oral pronouncement of sentence.

When a defendant is convicted of a drug trafficking offense, U.S.S.G. § 2D1.1(b)(1) provides that "[i]f a dangerous weapon (including a firearm) was possessed," the sentencing calculation should be "increase[d] by 2 levels." The commentary to this Guideline explains that the enhancement "reflects the increased danger of violence when drug traffickers possess weapons." U.S.S.G. § 2D1.1 cmt. n.11. According to the commentary, "[t]he enhancement should be applied if the weapon was present, *unless it is clearly improbable* that the weapon was connected with the offense." *Id.* (emphasis added). To illustrate when it might be clearly improbable that a weapon is connected to the offense, the commentary explains that "the enhancement would not be applied if the defendant, arrested at the defendant's residence, had an unloaded hunting rifle in the closet." *Id.* We have noted that the clearly improbable standard presents a significant hurdle that "defendants have rarely been able to overcome." *Drozdowski*, 313 F.3d at 822.

"[T]he question of whether it is clearly improbable that a gun was used in connection with a drug offense is a fact-bound determination." *Drozdowski*, 313 F.3d at 823. We have identified four factors relevant to this inquiry:

> (1) the type of gun involved, with clear improbability less likely with handguns than with hunting rifles, (2) whether the gun was loaded, (3) whether the gun was stored near the drugs or drug paraphernalia, and (4) . . . whether the gun was accessible.

18

*Id.* at 822–23 (internal citations omitted).

During the sentencing hearing, the Government correctly noted that, because a weapon was found at the house, the firearm enhancement should be applied "unless it's clearly improbable that the weapon was connected to the offense." App. 401. The prosecutor then addressed the *Drozdowski* factors and argued that all four weighed in favor of the enhancement. He emphasized that the Browning .32 caliber handgun found just outside the office "was a loaded handgun found directly near the cocaine within feet of it, and [was] obviously accessible, as it was right on the mantle [sic]." App. 402. Further, the Government contended that the enhancement was applicable in "consider[ation] [of] the fact that [an] additional two other handguns [were] found, one on the safe, one inside the safe, and as well as [the fact that] the hunting rifle[s] were all found directly next to the nearly one kilogram of cocaine." App. 403.

The District Court rejected these arguments, giving the following explanation for its refusal to apply the enhancement:

> I don't believe the enhancement is applicable here. I think the firearms are not the type of firearms that *certainly* are used by gun [sic] dealers. Having had two extensive gang/drug related cases over the last couple years . . . , these are not the type of firearms in my experience . . . that are used in connection with drug trafficking. Secondly, the one weapon that's pointed to, again, was not physically in

19

the same room; and at least as I remember the testimony, it was certainly not within a "few feet" of the safe.

App. 404–05 (emphasis added).

Based on this discussion, we must conclude that the District Court misapplied the relevant standard under § 2D1.1(b)(1). Notably absent from the District Court's analysis is any reference to the "clearly improbable" standard set forth in the commentary to § 2D1.1. Instead, the Court rejected the enhancement because the guns recovered were "not the type of firearms that *certainly* are used by [drug] dealers." App. 404–05 (emphasis added). But the Government is not required to show that the firearms were "certainly" the type used by drug dealers. Such a requirement tortures the clearly improbable standard and plainly sets the bar too high.

The government bears the burden of proving by a preponderance of the evidence that a sentencing enhancement applies. *See United States v. Grier*, 475 F.3d 556, 568 (3d Cir. 2007) (en banc). With respect to § 2D1.1(b)(1), the government must show only that the defendant "possessed" a dangerous weapon, and it can do so by establishing "that a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant." *United States v. Ruiz*, 621 F.3d 390, 396 (5th Cir. 2010) (quoting *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764–65 (5th Cir. 2008)). Once the government makes out a prima facie showing that the defendant drug-dealer possessed a weapon, the burden of production shifts to the defendant to

20

demonstrate that the connection between the weapon and the drug offense was "clearly improbable." *See United States v. Greeno*, 679 F.3d 510, 514 (6th Cir. 2012), *cert. denied*, 133 S. Ct. 375 (2012) (explaining that once the government has met its burden, the burden shifts to the defendant to present evidence showing the drug-weapon connection was "clearly improbable"). We emphasize that the ultimate burden of proving the applicability of the enhancement remains at all times with the government. But once the government has made a prima facie showing that the defendant possessed the weapon, the enhancement should be applied unless the defendant can demonstrate that the drug-weapon connection was clearly improbable.

This burden shifting approach follows from the plain language of U.S.S.G. § 2D1.1(b)(1). The Guideline itself does not require a connection between the firearm and the drug offense, but requires only that the firearm was "possessed" by the defendant. U.S.S.G. § 2D1.1(b)(1). The commentary elaborates on the possession requirement, explaining that the adjustment should be applied "if the weapon was present, *unless* it is clearly improbable that the weapon was connected with the offense." U.S.S.G. § 2D1.1 cmt. n.11 (emphasis added). The term "unless" creates an exception to the general rule that the enhancement should be applied if a firearm was present. And the party seeking the exception, here the defendant, bears the burden of showing that he qualifies for its invocation.

We have not previously described the shifting burdens under § 2D1.1(b)(1) in this manner. *See United States v. Thornton*, 306 F.3d 1355, 1357 (3d Cir. 2002) (noting only

21

*dicta* from our court on the issue). In adopting this burden-shifting framework today, we join the vast majority of our sister circuits that have addressed the question. *See, e.g.*, *Ruiz*, 621 F.3d at 396 ("The Government bears the burden of proving by a preponderance of the evidence that the defendant possessed the weapon . . . . If the Government meets that burden, the burden shifts to the defendant to show that it was clearly improbable that the weapon was connected with the offense."); *United States v. Smythe*, 363 F.3d 127, 128 (2d Cir. 2004) (articulating same burden shifting approach); *United States v. Fudge*, 325 F.3d 910, 922 (7th Cir. 2003) (same); *United States v. Alexander*, 292 F.3d 1226, 1231 (10th Cir. 2002) (same); *United States v. Harris*, 128 F.3d 850, 853 (4th Cir. 1997) (same); *United States v. Hill*, 79 F.3d 1477, 1485 (6th Cir. 1996) (same); *United States v. Hall*, 46 F.3d 62, 63 (11th Cir. 1995) (same); *United States v. Corcimiglia*, 967 F.2d 724, 727–28 (1st Cir. 1992) (same); *United States v. Restrepo*, 884 F.2d 1294, 1296 (9th Cir. 1989) (same).

Only the Eighth Circuit has staked out a different path, declaring that "[t]he government must . . . show that it is not clearly improbable that the weapon was connected to the drug offense." *United States v. Peroceski*, 520 F.3d 886, 889 (8th Cir. 2008). We consider this approach logistically problematic. It would essentially require the government to prove a negative—i.e., that a connection between a weapon and the defendant's drug activity was "probably not clearly improbable"—before the sentencing court could impose the enhancement. But more importantly, we believe such an approach is inconsistent with the text of § 2D1.1 and for that reason decline to adopt it as the law of this circuit.

22

The Government here met its burden of showing that Napolitan possessed a weapon. It presented evidence that the safe where the drugs were found was filled with firearms of all types, and that there were two other handguns outside the safe in the general vicinity of the drugs and drug paraphernalia. Thus, the burden of production should have shifted to Napolitan to come forward with evidence showing that the connection between the firearms and the drug offense was clearly improbable. Instead of following this procedure, the District Court required the Government to prove that the guns were "certainly" the type used by drug dealers. Imposing such a burden on the Government was improper.

Our conclusion that the Court misapplied the standard is not based solely on the fact that the Court never invoked the term "clearly improbable." This omission might be forgivable if the record indicated that the Court otherwise considered the pertinent factors we have identified for the clearly improbable determination. *See Drozdowski*, 313 F.3d at 822–23. But the record does not provide such an indication.

As already noted, the Government argued at sentencing that the enhancement was warranted based on any one of the three handguns found in or around the safe. Specifically with respect to the .32 caliber on the mantel, the Government argued that the *Drozdowski* factors favored application of the enhancement because it was (1) a handgun (which is generally the type of firearm involved in drug trafficking crimes), (2) loaded, (3) in close proximity to where the drug paraphernalia was first observed because it was just outside the only entrance to the office, and (4) easily accessible. Despite the Government's methodical discussion

23

of each of the four *Drozdowski* factors, the only reason provided by the District Court for not applying the enhancement was that the .32 caliber handgun on the mantel "was not physically in the same room" as the drugs and "not within a few feet of the safe." App. 405. This statement fell woefully short of the analysis that was required.

As a preliminary matter, the Court failed to acknowledge either the .22 caliber pistol sitting on top of the safe or the handguns inside the safe, all of which the Government explicitly referenced in support of the enhancement. Because we are unable to evaluate whether the Court properly considered these weapons in light of the four *Drozdowski* factors, we must assume it did not.

With respect to the Browning .32 caliber pistol (which the Court did address), the Court noted only that this firearm was "not within a 'few feet' of the safe" where the drugs were stored. App. 405. This statement, however, ignores the gun's proximity to the desk where the sandwich baggies, digital scale, and other drug paraphernalia were first observed. Our cases demonstrate that § 2D1.1 may apply even where "there were no drugs in the house," provided the gun was found near other indicia of drug activity. *See Drozdowski*, 313 F.3d at 823 (applying enhancement where guns were discovered near "a great deal of drug paraphernalia," including "a large number of zip-lock bags," a bag of Inositol, and "owe sheets"). It was undisputed that this gun was recovered mere "steps" from the contraband on the desk.[6] This fact should

---

[6] At oral argument, defense counsel conceded that "it is a small house, so it is steps [from the mantel] to the office."

24

have been considered as part of the Court's analysis. *Id.* at 822 (listing as a factor "whether the gun was stored near the drugs *or drug paraphernalia*") (emphasis added).

The Court also placed too much emphasis on the fact that the Browning .32 caliber pistol was "not physically in the same room" as the drugs. The firearm enhancement may be appropriate in circumstances where weapons are found in a room other than the one where the contraband was ultimately discovered. *See Drozdowski*, 313 F.3d at 821 (applying enhancement despite that "there were no drugs in the house" where the firearms were discovered). Where, as here, a loaded handgun is found a few steps from a substantial collection of drug paraphernalia, a clearly improbable finding cannot be based solely on the fact that the gun was just beyond the only entrance to the room where the paraphernalia was recovered. Under these circumstances, a proper analysis requires consideration of the totality of the *Drozdowski* factors.

Rather than analyzing the four *Drozdowski* factors, the Court provided its own alternative grounds for denying the enhancement. First, it relied on its own personal experience with "two extensive gang/drug related cases," stating that this experience supported its finding that the guns were "not the type" used by drug dealers. App. 405. As defense counsel conceded at oral argument, the sentencing judge's previous trial experience was not evidence offered at sentencing and was not a proper basis for denying the enhancement. Second, the Court incorporated its reason underlying its previous dismissal of the 18 U.S.C. § 924(c) count, including its suggestion that Napolitan "has a constitutional right to carry a

25

handgun that's legally owned by him around his house." App. 176, 405. Needless to say, while the Second Amendment secures "the right of law-abiding, responsible citizens to use arms in defense of hearth and home," *District of Columbia v. Heller*, 554 U.S. 570, 635 (2008), it does not entitle a drug trafficker to carry a firearm in furtherance of his criminal exploits, nor does it have any bearing on the application of U.S.S.G. § 2D1.1(b)(1)'s firearm enhancement.

Based on the foregoing, we conclude that the District Court misapplied the controlling standard under U.S.S.G. § 2D1.1. We will vacate Napolitan's sentence and remand for resentencing consistent with the burden-shifting procedure outlined in this opinion.

## B.

The Government next argues that the District Court erred in refusing to apply a two-level enhancement under U.S.S.G. § 3C1.1, because Napolitan committed perjury at trial. Section 3C1.1 provides for a two-level enhancement if a defendant "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the . . . prosecution" through conduct that related to "the defendant's offense of conviction." U.S.S.G. § 3C1.1. The commentary provides that offering perjurious testimony constitutes an obstruction of justice. *See* U.S.S.G. § 3C1.1 cmt. n.4(B). A defendant who testifies under oath at trial commits perjury within § 3C1.1 if he "gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake,

26

or faulty memory." *United States v. Dunnigan*, 507 U.S. 87, 94 (1993).

The Government contends that Napolitan committed perjury within this definition when he testified on direct and cross-examination that he was unaware of both the cocaine stored in his safe and the drug paraphernalia scattered throughout his home office.[7] It further argues that these

---

[7] The following excerpts from Napolitan's direct examination are relevant to the Government's claim that he committed perjury:

Q:    Okay. Did you ever see any cocaine in the safe until they seized the safe and showed you the evidence?
A.    No, sir.
. . . .
Q:    Were you dealing drugs out of your home in Farrell?
A:    No, sir.

App. 202–03. Additionally, the Government cites the following exchange, which occurred on cross-examination following multiple questions regarding the "digital scales," "plastic baggies with the corners cut off," and "inositol" found in Napolitan's home office:

Q:    So you never walked by the office?
A:    Yes. I did.
Q:    You never saw evidence of drug packaging going on?

27

denials were made with willful intent to mislead the jury regarding a material issue, namely his possession of the cocaine with the intent to distribute it. According to the Government, the falsity of Napolitan's testimony was established through the testimony of the Government's witnesses, including Rodemoyer, and was necessarily implicit in the jury's verdict finding Napolitan guilty of the charged drug-trafficking offense.

The District Court denied the Government's request for a perjury enhancement under § 3C1.1, offering the following explanation for its decision:

> I don't know that the record supports it, and I am concerned that it really has a chilling effect on a Defendant that provides a defense in the case, including taking the stand or putting witnesses on the stand.

App. 466. The Government argues that both of these grounds were improper. First, it argues that the District Court impermissibly based its determination on a policy concern that imposition of the perjury enhancement will have a "chilling effect" on a defendant's right to testify. Second, the Government contends that the Court's assertion, "I don't know that the record supports it," was not a sufficient factual finding to support its decision. "We review the factual findings underlying the District Court's perjury determination

---

A:   No, sir.

App. 218.

for clear error, while exercising plenary review over the District Court's conclusions of law." *United States v. Miller*, 527 F.3d 54, 75 (3d Cir. 2008).

We agree that a district court cannot refuse to apply § 3C1.1 based solely on a policy concern that the enhancement deters defendants from exercising their fundamental right to testify at trial. Whatever the merit of such a concern, that ship has sailed. The Supreme Court has explicitly rejected the argument that permitting a perjury enhancement under § 3C1.1 unconstitutionally infringes on a defendant's right to testify. *Dunnigan*, 507 U.S. at 96 ("Respondent cannot contend that increasing her sentence because of her perjury interferes with her right to testify, for we have held on a number of occasions that a defendant's right to testify does not include a right to commit perjury."). *See also United States v. Boggi*, 74 F.3d 470, 479 (3d Cir. 1996) (noting that *Dunnigan* rejected the argument that the perjury enhancement penalizes a defendant for testifying at trial because "a defendant's right to testify does not include a right to commit perjury"). For this reason, it is reversible error for a district court to reject § 3C1.1 based only on this policy concern. That said, the District Judge here did not reject the enhancement solely on policy grounds. He also stated: "I don't know that the record supports it." App. 466. We must, therefore, evaluate the sufficiency of this alternative reason.

The Government argues that the District Court's comment, "I don't know that the record supports [the enhancement]," was insufficient because it does not constitute a factual finding that Napolitan did or did not commit perjury. In support of its argument that more substantial findings were

required, the Government relies principally on the Supreme Court's decision in *Dunnigan*. In that case, the Court held that whenever a defendant challenges a sentencing enhancement under § 3C1.1 based on perjured testimony, "the trial court must make findings to support all the elements of a perjury violation in the specific case." 507 U.S. at 97. Pursuant to this directive, we have repeatedly vacated sentences and remanded where district courts applied the perjury enhancement without making an express finding that the defendant committed perjury. *See, e.g.*, *United States v. McLaughlin*, 126 F.3d 130, 140 (3d Cir. 1997); *United States v. Fiorelli*, 133 F.3d 218, 224 (3d Cir. 1998). *Cf. Miller*, 527 F.3d at 78–79 (noting *Dunnigan*'s requirement that trial courts make "independent findings" on each element of perjury, but ultimately vacating because the prosecution's questions at trial were not sufficiently precise to form a predicate for the enhancement).[8]

Napolitan argues that *Dunnigan* is inapplicable because it involved a defendant's appeal from a judgment of

---

[8]  We have noted that "it is preferable for a district court to address each element of the alleged perjury in a separate and clear finding"—i.e., to specifically make findings that the defendant (1) gave false testimony (2) concerning a material matter (3) with the willful intent to provide false testimony. *Boggi*, 74 F.3d at 479 (quoting *Dunnigan*, 507 U.S. at 95). However, we do not require separate findings on each individual element if "the court makes a finding that encompasses all of the factual predicates for a finding of perjury." *Id.* (quoting *Dunnigan*, 507 U.S. at 95); *see also United States v. Gricco*, 277 F.3d 339, 362 (3d Cir. 2002).

sentence that *included* a two-level enhancement under §
3C1.1, not the converse situation presented here, where the
government brings an appeal challenging a district court's
*rejection* of the enhancement. Although *Dunnigan* did not
address the situation that we confront, the Government
contends that the requirement to make explicit factual
findings should operate with equal force when a district court
declines to apply the enhancement.

We are not persuaded that *Dunnigan* controls here.
The fact-finding requirement set forth in *Dunnigan* was
rooted in a concern that "fear of an *unjustified* enhancement
may chill exercise of the defendant's constitutional right to
testify in his own defense." *Fiorelli*, 133 F.3d at 221 (citing
*Dunnigan*, 507 U.S. at 97) (emphasis added). Requiring a
sentencing court to explicitly find that the defendant
committed perjury alleviates that concern because it helps to
ensure the enhancement is imposed only if the government
establishes that the defendant committed perjury—i.e., gave
false testimony concerning a material matter with the willful
intent to mislead the jury. *See United States v. Alvarado-*
*Guizar*, 361 F.3d 597, 606 (9th Cir. 2004) (noting that
*Dunnigan*'s fact-finding requirement provides a "procedural
safeguard designed to prevent punishing a defendant for
exercising her constitutional right to testify"). But the same
concerns underpinning *Dunnigan*'s rule are not implicated
when the enhancement is being rejected. As the Ninth Circuit
explained:

> Unlike a testifying criminal defendant, the
> government does not face the risk of automatic
> punishment for its witnesses' testimony in an

31

unsuccessful trial, nor does it have a constitutional or statutory right similar to the accused's with respect to trial testimony. Simply put, the government does not face the dangers that *Dunnigan*'s requirement of factual findings is designed to prevent.

*Id.*

For this reason, several of our sister circuits have held that there is no requirement for a district court to make factual findings when electing not to apply § 3C1.1. *See United States v. Vegas*, 27 F.3d 773, 783 (2d Cir. 1994) ("*Dunnigan* does not suggest that the court make findings to support its decision *against* the enhancement.") (emphasis in original); *Alvarado-Guizar*, 361 F.3d at 606 ("There is no parallel that requires the same result when a defendant is not receiving a longer sentence."). We agree with these courts that *Dunnigan* does not compel explicit factual findings when a sentencing judge decides not to impose the perjury enhancement.

Nevertheless, the fact that *Dunnigan* does not entitle the government to specific factual findings does not mean that such findings are without jurisprudential value. Our decisions "place a premium on thorough explication of sentencing decisions." *United States v. Grier*, 475 F.3d 556, 572 (3d Cir. 2007) (en banc). And we have routinely instructed that sentencing judges must create a record showing that their decisions are "the product of comprehensive and thoughtful deliberation." *Id*. *See United States v. Palma*, 760 F.2d 475, 480 (3d Cir. 1985) (noting "the importance of the district court's making findings of fact to facilitate meaningful

32

appellate review of its discretionary ruling"); *cf. Jackson v. Danberg*, 594 F.3d 210, 230 (3d Cir. 2010) (noting that a court's failure to articulate reasons for its conclusion "makes our role as a reviewing court needlessly arduous, and sometimes even practically impossible"). As we have explained, "[a] reasoned and rational justification for a sentence is necessary to assure the parties of the fairness of the proceedings, to instill public confidence in the judicial process, and to allow for effective appellate review." *Grier*, 475 F.3d at 572. We see no reason why the importance of "a reasoned and rational justification" is diminished when a court declines to impose a requested enhancement.

The Fifth Circuit addressed this same sentiment in *United States v. Humphrey*, 7 F.3d 1186, 1190 (5th Cir. 1993):

> Although this result is not explicitly compelled by *Dunnigan* . . . , we find that the district court did have an obligation to make a finding of whether Humphrey committed perjury in its consideration of the government's objection. We see little merit in Humphrey's contention that the district court is only required to make specific findings when addressing objections made by a defendant. Implicit in the government's right to object to guideline determinations, and our obligation to review those determinations, is the district court's obligation to make all factual findings necessary to establish the basis for its decisions.

33

*See also United States v. Tracy*, 989 F.2d 1279, 1290 (1st Cir. 1993) (vacating the sentence and remanding to the district court "to make findings to support all the elements of a perjury violation, or to articulate clearly the elements it believes have not been satisfied") (internal quotation marks omitted). We agree with *Humphrey* that we cannot fulfill our obligation to review Guideline determinations unless the reasoning underlying the court's conclusion is readily discernible from the record. We thus exercise our supervisory power to hold that, in evaluating whether to apply the perjury enhancement under § 3C1.1, a district court must make an explicit factual finding that the defendant did or did not give false testimony concerning a material matter with the willful intent to mislead the jury. *See Palma*, 760 F.2d at 480 (noting our "supervisory power to require district courts in the future to make specific findings as to the factual issues that are relevant" to a particular sentencing decision).

Turning to the record before us, we conclude that the Court's statement, "I don't know that the record supports it," is not a sufficient articulation of its reason for refusing to apply § 3C1.1. Significantly, this remark does not set forth the Court's finding with respect to the critical issue—whether Napolitan committed perjury. The Court may have been disinclined to impose the enhancement in light of the revelation at sentencing that Rodemoyer had in fact ordered a key to the safe. Or maybe the Court's decision was based on its noted perception that Rodemoyer lacked credibility. *See* app. 480 (stating that the Court "questioned the credibility of Miss Rodemoyer" during trial and sentencing). Yet these are not proper reasons for denying the enhancement if Napolitan did, in fact, commit perjury. Application of § 3C1.1 is not

34

discretionary. If a district court determines that an "accused has committed perjury at trial, an enhancement is required." *Dunnigan*, 507 U.S. at 98. Conversely, if the defendant did not commit perjury, the enhancement should be rejected.

The District Court's suggestion of agnosticism on the question of Napolitan's possible perjury does not provide us with a sound basis for review. On remand, the District Court must make a finding as to whether the Government has met its burden of proving by a preponderance of the evidence that the defendant perjured himself. The District Court must either make findings to support all the elements of a perjury violation, or clearly express which elements it believes have not been proven. In evaluating the falsity of Napolitan's testimony, "the sentencing court [is bound] to accept the facts necessarily implicit in the verdict." *Boggi*, 74 F.3d at 479. If the record also provides support for findings that a false statement was material and willful, the enhancement must be applied. *Dunnigan*, 507 U.S. at 98 ("Upon a proper determination that the accused has committed perjury at trial, an enhancement of sentence is required by the Sentencing Guidelines.").

## IV.

For the reasons provided, we will affirm Napolitan's conviction, but will vacate his sentence and remand for resentencing in accordance with this opinion.

35