PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 20-2267

UNITED STATES OF AMERICA

v.

FOSQUE KINTE DENMARK,

Appellant

Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. Criminal Action No. 1-19-cr-00015-001)
District Judge: Honorable Sylvia H. Rambo

Argued on March 11, 2021

Before: SMITH, Chief Judge, McKEE and AMBRO, Circuit
Judges

(Opinion filed: September 10, 2021)

Quin M. Sorenson (Argued)
Frederick W. Ulrich
Office of Federal Public Defender
100 Chestnut Street, Suite 306
Harrisburg, PA 17101

                              Counsel for Appellant

Daryl F. Bloom (Argued)
Stephen R. Cerutti, II
Office of United States Attorney
Middle District of Pennsylvania
228 Walnut Street, P.O. Box 11754
220 Federal Building and Courthouse
Harrisburg, PA 17108

                              Counsel for Appellee

---

OPINION OF THE COURT

---

AMBRO, Circuit Judge

In *United States v. Perez*, 5 F.4th 390 (3d Cir. 2021), we considered whether spatial proximity between firearms and drugs is sufficient to connect the firearms to a drug offense

under the Sentencing Guidelines.[1]  This case presents the inverse issue: whether spatial proximity of guns to drugs is necessary to establish such a connection under another Guideline provision, U.S.S.G. § 2D1.1(b)(1).[2]  We have already concluded that it is not.  *United States v. Drozdowski*, 313 F.3d 819, 823 (3d Cir. 2002).  Although the connection in this case is so tenuous as to place it on the outer edge of the sentencing enhancement, defendant Fosque Kinte Denmark has not carried his burden of proving that the connection was clearly improbable, which is the test we apply.  We thus affirm the District Court's application of the enhancement.

## I. BACKGROUND

In July 2018, Pennsylvania police intercepted a suspicious package that had been shipped from California to York, Pennsylvania.  The package contained five pounds of methamphetamine.  Police later determined that Denmark shipped the package.

In December 2018, law enforcement recorded a FaceTime call with Denmark.  During the call, Denmark confirmed his involvement with the July 2018 shipment.  The caller ordered an additional three pounds of meth from

---

[1] The provision there was U.S.S.G. § 2K2.1(b)(6)(B), which requires a four-level sentencing enhancement where a defendant "used or possessed any firearm . . . in connection with another felony offense."

[2] We use "guns," "firearms," and "weapons" interchangeably here, though this Guideline applies to all "dangerous weapon[s]." *Id.*

3

Denmark, who was to ship the drugs to York. When the package arrived in York, he confirmed its delivery via phone. The meth in the package was in a "heat-sealed bag" wrapped in several layers of shrink wrap. App. at 60, Hr'g Tr. 27:6–19.

In January 2019, police carried out a search warrant for Denmark's residence. They confirmed that Denmark had conducted the December 2018 call in that location, as the residence matched his background during the call. Police did not recover any drugs, but they did find stashes of firearms and drug paraphernalia in various parts of the house: a semi-automatic assault rifle and shotgun, both unloaded (found under a bed in a second-story bedroom); two handguns, one loaded and one unloaded (found in a safe in the second-story bedroom's closet); a heat-sealed plastic bag, an empty box that had contained more heat-sealed bags, and shrink wrap matching the packaging on the meth shipments (found in duffel bags in a first-story closet and the garage); a gun scope (also found in a duffel bag on the first floor); and a bullet-proof vest (found in a container in the garage).

Law enforcement also found several loaded and unloaded magazines for the handguns and the assault rifle (including three high-capacity magazines) and over 900 rounds of ammunition (including 835 loose rounds and 74 rounds loaded in magazines).[3] Some of these items were in the bedroom where the guns were located.

---

[3] At sentencing the Government asserted the stash also included armor-piercing rounds, but it later conceded this was incorrect. The ammunition did, however, include flammable rounds that could ignite a target on impact.

4

The grand jury indicted Denmark on two counts of distribution and possession with intent to distribute at least 500 grams of meth, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(viii). Count 1 concerned the July 2018 shipment and Count 2 the December 2018 shipment. Denmark pled guilty to Count 2 in exchange for the dismissal of Count 1 and a three-level reduction for acceptance of responsibility.

At sentencing Probation calculated Denmark's offense level as 35, which gave a Guidelines imprisonment range of 168 to 210 months and a mandatory minimum of ten years. The calculation included a two-level enhancement for possession of a dangerous weapon under U.S.S.G. § 2D1.1(b)(1). Defense counsel objected to the weapons enhancement, arguing that the firearms could not have been connected with Denmark's offense of conviction because the meth had never been at his residence. Counsel asserted that Denmark was the middleman between the meth supplier and the purchaser and that he merely took the package to the post office. Counsel acknowledged that law enforcement had recovered drug paraphernalia at Denmark's home but asserted that he had only used the paraphernalia for his marijuana-dealing business.

The District Court rejected this argument, ruling that "there has been sufficient evidence by the [G]overnment to support the possession of firearms . . . ." App. at 68, Hr'g Tr. 58:18–20. The Court thus applied the two-level enhancement, leaving Denmark's Guidelines range at 168 to 210 months. The Court varied downward, however, based in part on his previous charitable service and family responsibilities. It ultimately sentenced Denmark to 135 months' imprisonment,

5

a year and a quarter over the ten-year mandatory minimum. He now appeals to us.

## II. JURISDICTION AND STANDARD OF REVIEW

The District Court had subject-matter jurisdiction over Denmark's prosecution for federal crimes under 18 U.S.C. § 3231. We have appellate jurisdiction over the District Court's final judgment under 28 U.S.C. § 1291. We also have jurisdiction in sentencing appeals under 18 U.S.C. § 3742(a).

In this context, "[w]e review a district court's factual determinations for clear error" and reverse only if, "when reviewing the entire record, we are left with the definite and firm conviction that a mistake has been committed." *United States v. Napolitan*, 762 F.3d 297, 307 (3d Cir. 2014) (internal quotation marks omitted). But we exercise plenary review over a district court's interpretation of the Guidelines. *Id.*

Here the parties do not dispute most of the facts; they disagree primarily as to what the Guidelines standard requires. We thus conduct a fresh review of the District Court's legal interpretation. However, we have said that a court's decision to apply the enhancement for weapons is "essentially factual," meriting only clear-error review. *Drozdowski*, 313 F.3d at 822. This is because whether the defendant has disproven a connection between his weapons and his offense is a "fact-bound determination." *Napolitan*, 762 F.3d at 308 (internal quotation marks omitted). Hence we review for clear error the District Court's determination concerning the connection, or lack of it, between guns and drugs.

6

### III. ANALYSIS

Denmark argues that, for the weapons enhancement to apply, the guns had to be "actually 'present' at the crime," Denmark's Br. at 8, meaning they had to be physically near him while he transported the meth to the post office. We are unpersuaded.

Besides the drug paraphernalia on the first floor, the Government does not have any evidence that Denmark ever had meth in his home. Moreover, the paraphernalia and the guns were found in different rooms and on different floors. Denmark essentially argues that these facts resolve the case. Our threshold inquiry, then, is whether a firearm must be physically close to drugs or drug paraphernalia for the enhancement in U.S.S.G. § 2D1.1(b)(1) to apply. The answer is no.

Section 2D1.1(b)(1) provides that, in a conviction for unlawful manufacturing, importing, exporting, or trafficking of drugs, "[i]f a dangerous weapon (including a firearm) was possessed, increase [the offense level] by 2 levels." Application Note 11(A) to this provision provides:

> The enhancement for weapon possession in subsection (b)(1) reflects the increased danger of violence when drug traffickers possess weapons. The enhancement should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at

7

the defendant's residence, had an unloaded hunting rifle in the closet.

U.S. Sent'g Guidelines Manual § 2D1.1(b)(1) cmt. n.11(A) (U.S. Sent'g Comm'n 2018).

We explained the mechanics of this analysis in *United States v. Napolitan*, where we observed that the Government must first prove, by a preponderance of the evidence, "only that the defendant possessed a dangerous weapon." 762 F.3d at 309 (internal quotation marks omitted). The burden of production then shifts to the defendant to "demonstrate that the connection between the weapon and the drug offense was clearly improbable." *Id.* (internal quotation marks omitted). Under this approach, then, the Government does not have to prove any relationship between the weapons and the drugs. Rather, the "general rule" is that "the enhancement should be applied if a firearm was present." *Id.* It is the defendant's burden to show the *lack* of a connection. *Id.*

Denmark argues that "the record must show 'that a temporal and spatial relation existed between the weapon, the drug[-]trafficking activity, and the defendant.'" Denmark's Br. at 6 (quoting *Napolitan*, 762 F.3d at 309). *Napolitan*, as noted, instructs otherwise; the Government "must show only that the defendant possessed a dangerous weapon," 762 F.3d at 309 (internal quotation marks omitted), and it "can" make that showing "by establishing 'that a temporal and spatial relation existed between the weapon, the drug trafficking activity, and the defendant,'" *id.* (quoting *United States v. Ruiz*, 621 F.3d 390, 396 (5th Cir. 2010) (*per curiam*)). The use of "can" provides a path to proving possession, but it is not the only one. Thus the Government is not required to prove a "temporal and

8

spatial relation"—or any relation at all—between the firearms and the drugs to carry its initial burden. *See id.*

We are mindful that *Napolitan* seems to require physical proximity to drugs or paraphernalia, as we stated there that the enhancement applies "even where there were no drugs in the house, *provided the gun was found near other indicia of drug activity*." 762 F.3d at 310 (emphasis added) (internal quotation marks omitted). But the "indicia of drug activity" language, we think, is a mere proxy for what the Commentary to the Guideline requires: a connection (which we understand to exist once the Government proves the defendant possessed a firearm) between the guns and the drug-trafficking offense. *See* U.S. Sent'g Guidelines Manual § 2D1.1(b)(1) cmt. n.11(A). Here, law enforcement observed Denmark make a drug deal over FaceTime from his home. Thus we do not need to rely on "indicia" of drug activity found at the home because officers observed *actual* drug activity there.

Moreover, as we discuss next, physical proximity between drugs (or paraphernalia) and guns is only one of four factors we must consider in making the "clearly improbable" determination. We have never considered the physical-proximity factor to be dispositive as a matter of law, and we decline to do so here. We note, however, that the absence of physical proximity between guns and drugs or paraphernalia might be dispositive in some cases. For example, if a defendant kept guns in a storage unit and conducted drug deals at a house in a different city, the defendant might be able to demonstrate that the connection was clearly improbable based on the guns' location alone. In that circumstance, the guns might be "truly inaccessible" to the defendant during the drug-trafficking offense. *See Drozdowski*, 313 F.3d at 823 n.2. We

9

reject only the narrow position that § 2D1.1(b)(1) can *never* apply unless the guns are physically near drugs or paraphernalia. And this case illustrates why: Although Denmark may never have possessed meth at his residence, police watched him agree to sell the meth via FaceTime in the same home where the guns were found a month later. That alone makes it difficult for him to show that the guns were not connected with his drug offense.

Denmark also contends that the enhancement in § 2D1.1(b)(1) applies only when the weapons were "present at the crime." Denmark's Br. at 7 (internal quotation marks omitted). According to him, the guns could not have been present at the crime because the drug delivery occurred through the mail, away from his home. Note 11(A), however, does not require that the weapons be "present at the crime"; it requires only that the weapons be "present." U.S. Sent'g Guidelines Manual § 2D1.1(b)(1) cmt. n.11(A); *see also Napolitan*, 762 F.3d at 309. And *Napolitan* instructs that, to make a *prima facie* showing, "the [G]overnment must show *only* that the defendant possessed a dangerous weapon" without regard to where that weapon was located at the time of the crime. 762 F.3d at 309 (emphasis added) (internal quotation marks omitted).

Denmark concedes, consistent with the Government's evidence, that he possessed the guns found at his residence. So his argument—that the enhancement cannot apply because his guns were not close to drugs or paraphernalia—fails. The burden now falls on him to demonstrate that the connection between his weapons and the drug offense is clearly improbable. *Id.*; *see also Drozdowski*, 313 F.2d at 822 (noting

10

that "defendants have rarely been able to overcome the 'clearly improbable' hurdle").

In this case, a clearly improbable finding between firearms and drug activity is not a hurdle for Denmark but a wall.  Though the District Court held an evidentiary hearing on whether the enhancement in § 2D1.1(b)(1) applied, it made almost no express findings on the issue and did not address directly whether Denmark met the clearly improbable standard.  It stated only that it "believe[d] that there has been sufficient evidence by the [G]overnment to support the possession of firearms," App. at 68, Hr'g Tr. 58:18–20, and adopted the presentence report "without change," *id.* at 69, Hr'g Tr. 61:25–62:1.  Denmark now objects that this was error.  Ordinarily we would remand, but here it is not necessary, for we can see nothing in the record to hint at dispelling the firearms-drug activity connection. *See United States v. Fishoff*, 949 F.3d 157, 164 (3d Cir. 2020) ("[I]t is evident from the [C]ourt's . . . ruling that any further explanation on the part of the [C]ourt would not have changed the sentence it imposed.  Thus[] any error is harmless.").

In determining whether it is clearly improbable that a weapon was connected with a drug offense, we look to four factors: "(1) the type of gun involved, with clear improbability less likely with handguns than with hunting rifles, (2) whether the gun was loaded, (3) whether [it] was stored near the drugs or drug paraphernalia, and (4) [] whether [it] was accessible." *Napolitan*, 762 F.3d at 308 (quoting *Drozdowski*, 313 F.3d at 822–23).

Here, at least three of the four factors weigh against Denmark.  First, he had two handguns, a semi-automatic

assault rifle, and a shotgun at his residence. While the shotgun could have been a hunting rifle, the other two types of firearms—particularly the handguns—suggest that they were connected with Denmark's drug activities rather than sporting or any other innocent use. *See Drozdowski*, 313 F.3d at 822 (agreeing with the Seventh Circuit that handguns are "tool[s] of the [drug] trade" because they are "easy to conceal yet deadly" (quoting *United States v. Cantero*, 995 F.2d 1407, 1411 (7th Cir. 1993))).

Second, law enforcement found one handgun with a loaded magazine in it (although no rounds were chambered). They also found several loaded magazines in the residence; at least some of the loaded magazines were recovered in the same bedroom as the guns. This factor also weighs against Denmark.

As for the third factor—whether the firearms were found near drugs or drug paraphernalia—the guns were all found in a second-story bedroom, whereas the drug paraphernalia were found in the garage and on the first floor. They were further away than the guns and drug paraphernalia in *Drozdowski*, which were all found in the same room. 313 F.3d at 823. But all the items here were in the same house where law enforcement observed Denmark making drug deals, and he has not argued that their precise location in the house demonstrates a lack of connection (for example, he does not argue that another resident had exclusive control over the parts of the house where the paraphernalia were stored).[4] This factor, then, does not help Denmark.

---

[4] At sentencing, Denmark argued that he only used the paraphernalia for his marijuana-selling business, and thus they

12

Fourth and finally, the guns were sufficiently accessible to someone who already knew where they were located and had access to those locations. *See id.* In *Drozdowski* we agreed with the Sixth Circuit that a defendant's guns were accessible when several were stored under furniture or in secret compartments and a handgun was stored in a safe in a bedroom. *Id.* at 824 (citing *United States v. McGhee*, 882 F.2d 1095, 1099 (6th Cir. 1989)). We adopted the Court's reasoning that, although the guns were inaccessible to strangers, "they would be readily accessible to anyone who knew their location." *Id.* (quoting *McGhee*, 882 F.2d at 1099). Here anyone who knew the guns were located in the safe and could open it would have been able to access them quickly. And we note yet again that law enforcement observed Denmark make a drug deal over FaceTime in the same house where the guns were found just a month later. This is strong evidence that Denmark had access to weapons during his drug-trafficking activities, and he has not produced any evidence to the contrary. As we cannot say that they were "truly inaccessible," *see Drozdowski*, 313 F.3d at 823 n.2, this is yet another factor that weighs against Denmark.

---

did not link his meth trafficking to the firearms. But he offers no evidence of this. The only evidence in the record is the Government's, which indicates that the paraphernalia in Denmark's house matched the packing materials in the meth he mailed. Moreover, even if we eliminated this factor entirely, our conclusion would be the same. The other three factors weigh heavily against Denmark, and the location at his home—even assuming there were no paraphernalia nearby—does not itself establish clear improbability because of the FaceTime call discussed earlier.

\*     \*     \*     \*     \*

While the broad reach of the enhancement in § 2D1.1(b)(1) may at times be concerning, it is not so here. Denmark had a small arsenal of weapons and ammunition in the same house where law enforcement observed him agreeing to provide several pounds of meth. As he has neither credibly rebutted any of the Government's evidence nor offered any plausible alternative explanation for why he possessed the weapons, we cannot say that the connection between the guns and the drugs was clearly improbable. Thus we affirm the District Court's application of the enhancement.